JEANINE B., by her next friend Robert BLONDIS; Aline H. by her next friend Wesley Scott; Maurice R. by his next friend Wesley Scott; Douglas R. by his next friend Wesley Scott; Carolyn D. by her next friend Cynthia Lepkowski; James B. by his next friend Mary Protz; Mindi D. by her next friend Sheila Smith; Alan A. by his next friend Sheila Hill–Roberts; Darren C. by his next friend Chris Velnetske; Alissa S. by her next friend Ann Marie Abell; Roxanne F. by her next friend Julia Vosper; Patricia S. by her next friend Oshiyemi Adelabu; Jocelyn Z. by her next friend Jane Moore; Derrick Z. by his next friend Jane Moore; Karen M. by her next friend Joan Zawikowski, individually and on behalf of all others similarly situated, Plaintiffs,

v.

Tommy G. THOMPSON, in his official capacity as Governor of the State of Wisconsin; Richard Lorang, in his official capacity as Acting Secretary of the Department of Health and Social Services of the State of Wisconsin; F. Thomas Ament, in his official capacity as the County Executive of the County of Milwaukee; and Thomas Brophy, in his official capacity as C .tor of the Milwaukee County Department of Human Services, Defendants.

Civ. A. No. 93–C–547.

United States District Court, E.D. Wisconsin.

March 2, 1995.

Christopher Dunn, American Civ. Liberties Union Children's Rights Project, New York City and Peter M. Koneazny, American Civ. Liberties Union of Wisconsin Foundation, Milwaukee, WI, for plaintiffs.

John F. Jorgensen, Principal Ass't Corp. Counsel, Office of Corp. Counsel, Milwaukee, WI, for Milwaukee county defendants.

Mary Woolsey Schlaefer and Peter C. Anderson, Ass't Attys. Gen., Madison, WI, for state defendants.

## DECISION AFTER ORAL ARGUMENT ON FEBRUARY 3, 1995 AND WRITTEN ORDER DATED FEBRUARY 16, 1995 DENYING IN PART AND GRANTING IN PART THE STATE DEFENDANTS' MOTION TO DISMISS AND GRANTING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

REYNOLDS, District Judge.

## I. INTRODUCTION

In this civil rights case, children who allegedly are or should be in the Milwaukee County foster care system have sued the Governor of Wisconsin, the Secretary of the Wisconsin Department of Health and Social Services ("Wisconsin DHSS" or, jointly, "the State defendants"), the Milwaukee County Executive, and the Director of the Milwaukee County Department of Human Services ("Milwaukee County DHS" or, jointly, "the County defendants").[1] The plaintiff children claim that the defendants run the Milwaukee foster care system in a manner which violates their rights, as created by the United States and Wisconsin Constitutions and by the Federal Adoption Assistance and Child Welfare Act, Child Abuse Prevention and Treatment Act, Rehabilitation Act, and Americans with Disabilities Act. The children seek a court order designed to stop these alleged violations. They do not ask for money damages.

The State defendants moved to dismiss the claims against them, primarily on the grounds that the county, and not the state, has direct responsibility for the foster children, and thus the State defendants argue that the children cannot allege that the State defendants *caused* the children's alleged de-

---

1. All defendants have been sued in their official capacities. The court has substituted Richard Lorang for former Wisconsin Department of Health and Social Services Secretary Gerald Whitburn.

privations. Nor do the State defendants believe that federal statutes give the children the right to sue them for the failures of the foster care system in Milwaukee County. On February 3, 1995, this court heard oral argument on the motion to dismiss, on the plaintiffs' motion for class certification, and on the plaintiffs motion to pursue discovery against the State defendants. After hearing the arguments, the court ruled orally that the plaintiffs had sufficiently alleged that the State defendants had some responsibility toward the foster children in Milwaukee County, that federal statutes give rise to private rights of action for the children, and that the State defendants would remain in the suit to defend against most of the claims. The court dismissed one of the claims brought against the State defendants under the Adoption Assistance and Child Welfare Act, along with the claims brought against the State defendants under the Americans with Disabilities Act and the Rehabilitation Act. The court also granted the plaintiff children's motion to certify a class, and created two subclasses. Finally, the court ordered that discovery between the plaintiffs and the State defendants begin immediately, and that the trial would be held on May 16, 1995.

This decision elaborates upon the February 3, 1995, oral rulings and the February 16, 1995, order reducing the oral rulings to writing. Section II summarizes the plaintiffs' lengthy complaint. Section III analyses the State defendants' motion to dismiss. Finally, Section IV elaborates on the court's class certification ruling.

## II. THE COMPLAINT

### A. Factual Allegations

The complaint makes several general allegations of systematic failures by the Milwaukee County DHS (Compl. ¶¶ 218–259), and illustrates these failures through the specific cases of fifteen plaintiffs. (*Id.* ¶¶ 58–217.)

The systematic failures alleged against Milwaukee County DHS include a long list of facts indicating a collapse of all stages of the foster care system. For instance, the complaint alleges that the defendants have failed to investigate adequately or at all reports of suspected abuse or neglect of children who are not yet in DHS custody. As specific allegations of failure to adequately investigate neglect and abuse, the complaint makes the following claims:

—Plaintiff Aline H. and her brothers, Plaintiffs Maurice and Douglas R., were left in their home despite the fact that their sister was in DHS custody. After Aline had been missing from school for several months, a Department social worker visited the home in March of 1988, and determined it to be a case of neglect. However, no one followed up with the case until May, when a Department worker went into the home and found it to be very dirty and unsanitary. At that time, the Department obtained custody of Aline but left three-year old Maurice and 18 month-old Douglas at home until July, when the Department worker returned and found conditions worse. (Compl. ¶¶ 73–78.)

—In May of 1991, a Department worker responding to a neglect report found that Plaintiff Carolyn D. (then three years old) lived in a filthy home without adequate food or medical attention. Carolyn and her brother were left in their parents' home without adequate efforts to provide services to the family. When Carolyn's father died in July 1991, her mother moved them to another family's home, where the man had a history of substance abuse and domestic violence. A DHS worker visited the home in August 1991, but the Department did not remove Carolyn and her brother from their mother's custody until October 1991. (*Id.* ¶¶ 87–91 )

—Plaintiff Alan A. (born in 1983) was placed in foster-care custody in December 1988 when his mother disappeared. In November 1992, the Department returned Alan to his mother's home, but did not supervise the home or provide services to Alan or his family. The DHS worker responsible for Alan's case was notified in January 1993 that Alan's mother was missing family therapy appointments, but the worker took no action. In fact, Alan's mother was not arranging court-ordered therapy, had been evicted from two or three residences during the year. In February 1993, Alan's mother was arrested and has been in custody since her arrest.

Alan was left in the care of his 16–year–old sister and his mother's live-in boyfriend. In March, the assigned Department caseworker, her supervisor, and the Children's Court guardian ad litem learned that the boyfriend had struck Alan with a belt on his right leg, and struck him on the back, leaving red marks on his leg, and a handprint on his back. They also learned that Alan's sister had a drug problem. The Department employees did nothing. Two days later, a Children's Court duty judge granted a pick-up order, but Alan was not taken into Department custody for four more days. (*Id.* at ¶¶ 130–145.)

—Plaintiff Patricia S. was six years old in 1989 when she was taken into custody after she and her mother "had been thrown out of the filthy, unfurnished attic of a drug house because [Patricia's mother] wanted to bring in men for money for drugs and the owner of the house wanted some of the proceeds." (*Id.* ¶ 184, *quoting* a Department report.) At the time, DHS had custody of Patricia's two brothers and one sister, but had made no efforts to protect Patricia or to offer her mother services. (*Id.* ¶ 185.)

The plaintiff children also assert that the state and county have failed to provide services to children and families to avert unnecessary entry of children into foster care during the approximately six months between the time that a child is taken from a home and the time when Children's Court finds that the child has been abused or neglected. They claim that the system fails to identify and develop available and appropriate placements, and to keep useful and reliable computerized information to match a child with a foster home. Further, they assert that the system does not properly train and supervise foster parents.

The children also allege that the defendants have failed to take children out of inappropriate and harmful foster homes, and to ensure that they receive necessary medical and dental care, and appropriate education. For instance:

—Plaintiff Jeanine B. alleges that the county placed her with a family that was already responsible for twelve children. In 1989, when Jeanine was eight years old, her foster father struck her with a plastic container, necessitating stitches. The foster mother referred to Jeanine as a "whore." In July 1990, Jeanine's therapist warned that conditions in her foster home were unacceptable, but Milwaukee County DHS did not attempt to locate a foster home which was trained to meet her needs, or to find an adoptive home for her. Jeanine remained in the foster home for two years. (Compl. ¶¶ 61–62.)

—Plaintiff James B. is a ten year-old boy who has allegedly lived with the same foster parents for most of his life. He receives "only marginal care in the home, which is chaotic." (*Id.* ¶ 114.) Many different foster children have come in and out of the home, and one has died. James does not get regular medical or dental care. (*Id.*).

The complaint alleges that the foster system fails to keep sibling groups together. For example, Alissa S. has two siblings with whom she allegedly has no contact because the children have been in separate foster homes. (Compl. ¶ 172.)

The plaintiff children assert that the defendants have failed to determine the appropriateness of visits between birth parents and their children, and failed to supervise and arrange those visits. As examples of the lack of supervision or appropriateness of visits, the complaint alleges that:

—Alan A.'s caseworker has refused to supervise his visits to his mother, who is currently in prison. Allegedly, Alan's mother has shown him her "track marks" from past drug use and has described incidents of oral sex between female inmates in the jail to Alan during these visits. (Compl. ¶¶ 147–148.)

—Aline H. has been forced to see her mother despite her desire not to and her therapist's recommendation against it. (*Id.* ¶ 82.)

—James B.'s mother is mentally ill and has once kidnapped him from his foster care home and taken him out of state. Nevertheless, the Department has continued to arrange parental visits, and James'

behavior after these visits has been aggressive and agitated. (*Id.* ¶¶ 110–111.)

Further, the children claim that social workers have failed to make and implement individual and appropriate case plans for children who enter foster care so that they may leave foster care custody within a reasonable period of time, that these social workers have failed to provide adequate services to children and their families that would allow children to return home when that is the planning goal for the family, and that they have failed to assess the reasonableness of return-home goals. For example, the complaint alleges that:

—Carolyn D.'s permanent plan has been to "return home", but her mother's home has not been assessed, visits have not been supervised, and the Department has not investigated whether her mother, who is living with a man with a substantial criminal record, is capable of providing an adequate home for Carolyn. (Compl. ¶ 98.)

—James B.'s mother is mentally ill and married to a man with a violent history, and has vacillated between a desire to regain custody of James, and a desire to give him up for adoption. The Department's plan for James remains "return home." (*Id.* ¶¶ 103–117.)

—Alan A.'s permanency plan remains "return home" despite the fact that his mother is in prison, has an abusive boyfriend, and has a history of drug abuse. (*Id.* ¶¶ 147–149.)

—Darren C. was born when his mother was sixteen. They were both taken into foster care and are now in separate foster homes. His mother has taken classes on mothering, visits Darren, and expresses a desire to take custody of him upon gaining her independence. However, the Department has taken no steps to aid her in attempting to provide a home for Darren. (*Id.* ¶¶ 152–160.)

The children also maintain that the defendants have failed to even try to terminate parental rights for children who need to be adopted until an adoptive home can be identified, have failed to seek an adoptive home until parental rights have been terminated, and have failed to allow foster parents to adopt foster children within a reasonable amount of time. As examples of this systematic failure to take steps to get children adopted, the plaintiffs allege that:

—In 1990, the Department's case plan goal for Jeanine B. was to have her parental rights terminated and free her for adoption. Her 1991, 1992, and 1993 plan goals were the same, yet the Department never tried to find adoptive parents for her, nor did it seek a court order to terminate parental rights despite two Milwaukee County DHS periodic reports saying that there were no major obstacles for achieving the plan. (Compl. ¶¶ 62, 66.)

—Maurice R.'s foster parent would like to adopt him and has taken steps to assure that he receives special education for his emotional problems. However, the Department has, as of April 1992, changed his plan from adoption to long-term foster care and has not permitted his foster mother to adopt him. (*Id.* ¶ 80.)

—Aline H. and Douglas R. are in a foster home together. Their foster mother would like to adopt them and the children have indicated their desire to be adopted. However, the only time a Department worker has visited the home was three years ago. The Department has chosen long-term foster care as the planning goal for these children. (*Id.* ¶ 81.)

—Mindi D.'s mother tried to give her away to a man in a furniture store when she was eleven months old, and has only seen her twice since Mindi was put in foster care eleven years ago. Mindi's case plan goal has been to terminate parental rights and adoption. Yet the Department has taken no serious steps to implement this plan. For several years, her foster family wanted to adopt her, but her caseworker thought another couple would be better, either because the foster parents are Caucasian and Mindi is African–American, or because Mindi's foster parents already have one adopted child. Yet the Department did not take steps to find an appropriate adoptive family for Mindi. Mindi now has behavioral problems and her foster parents no longer wish to adopt her. Her 1993 case plan has no mention of

a permanent plan for her. (*Id.* ¶¶ 119–124.)

—Alissa S. has been in foster care for over eight years since she was taken from her mother's home at age two due to lack of food, supervision, and medical attention, and suspected sexual abuse. For the first two years, the Department's permanency plan for Alissa was "return home," although the Department did not provide services which would make such a plan feasible and no basis for believing that it was realistic. In 1989, the Department changed Alissa' plan to termination of parental rights. In February 1991, a Children's Court judge found the Department had done little to implement the permanency plan and ordered a written update. The Department transferred Alissa' case to the adoption unit but has failed to locate an adoptive parent for Alissa. Her foster family has no interest in adopting her, and the Department does not consider them a suitable adoptive family, but has allowed Alissa to live there for more than five years. (*Id.* ¶¶ 161–171.)

—Jocelyn Z. was two years old, and her brother Derrick Z. was one when they were originally taken into foster care in 1987. An unsuccessful return home resulted in their mother signing a voluntary agreement relinquishing custody to the Department. The Department maintains a planning goal of "return home", yet has only made occasional telephone contact with the mother to assist her and has not found her to be taking meaningful steps to reassume responsibility for the children. Jocelyn and Derrick's foster parents would like to adopt them, and the children have the same wish. However, the Department has taken no steps to allow these children to be adopted. (*Id.* ¶¶ 192–205.)

The children also maintain that the system fails to adequately staff, train, and supervise Milwaukee County social workers, and assigns hundreds of cases to a computer for monitoring. For instance, allegedly, during at least part of her time in Milwaukee County DHS custody, Jeanine B. has not had a caseworker assigned to her. (Compl. ¶ 64.)

The defendants have also allegedly failed to maintain stability in the assignment of a child's caseworker and in foster family placements. For example, the plaintiffs allege that Jeanine B. has been in six different foster homes, and Roxanne F. has been in four.

Children with behavioral disabilities claim that the state and county have failed to provide necessary services, failed to train foster families, and failed to provide stability for them, and have not found permanent homes for children with behavioral problems solely because of those problems. As examples, the complaint alleges that:

—Jeanine B. has not been assessed or treated for emotional disturbances, despite behavioral problems. (Compl. ¶¶ 59–60.)

—The Department refuses to allow Maurice and Douglas R. to be adopted because of their serious behavioral problems, despite the fact that foster families wish to adopt them. (*Id.* ¶ 83.)

—Sixteen-year-old Karen M. was placed in a highly restrictive residential treatment center in 1992 to address her substance abuse problem. She completed the treatment program in late March 1993 but waited two months to be discharged because the Department has no available less restrictive placement for her. In May of 1993, the Department returned Karen to her maternal grandmother's home because there was no appropriate placement for her. Her grandmother lacks the resources and training to provide Karen with a therapeutic setting. (*Id.* ¶¶ 214–215.)

Allegedly, county workers have also failed to provide complete, truthful, and accurate information to the courts during periodic reviews, and failed to follow recommendations of the courts. The complaint alleges that a Children's Court judge has even directed the Milwaukee County DHS to turn Carolyn D.'s case over to a private agency, but the Department has not done so. (Compl. ¶ 98.)

The children also allege that state and county officials knew that the County foster care system failed many of its wards, and they failed to correct the situation. In support of this allegation, the complaint cites various officials' comments upon the Milwau-

kee County foster care system, including the testimony of the director of the Milwaukee County DHS, defendant Brophy, who stated before a judicial fact-finding tribunal in 1991:

> What happens is that with that kind of caseload what the workers are largely in the situation of doing now is that they are hopping from crisis to crisis to crisis. On a given day, if 10% of their caseload is in crisis, the worker could have anywhere from 10–12 families and kids that they may have to deal with. That means that the other 100 cases are left to languish. And it means that the orders of the court which can be very prescriptive relative to getting a mother into parent education classes, getting a mother into mental health assistance, helping a mother to get alcohol and drug assistance, maybe helping the child get some special programming, schooling, is simply not being carried out ...

> . . . . .

> [O]n the real extreme end, [children] may go into a home, they may stay there for long periods of time. Their behavior may deteriorate. And they may home hop to a point where in a child's life they could be in six to eight to ten foster homes before ... they reach age 18 and then just leave the system to the adult world. And even in some rare cases, but still too many, they may be abused and neglected in their own home, removed, put in a foster home and abused and neglected in that home and have to end up going into an institutional environment ...

(*Id.* ¶ 256.) Despite this and other alleged evidence that county and state officials knew that the system "irreparably damage[s and fails] to provide mandated services and protection to these vulnerable children," (*id.* ¶ 259), the defendants have allegedly failed and refused to take remedial action.

**B. Allegations of Responsibility**

The plaintiffs claim that the County defendants "are directly responsible for the administration of this system and for the damage that is being inflicted on children as a result

of these continuing and widespread violations of the law." (Compl. ¶ 253.)

The complaint also alleges that the State defendants are responsible for ensuring that the Milwaukee County child-welfare system follow the mandates of applicable law; that they failed to adopt rules and guidelines for the county to follow; and that they failed to provide necessary supervision in counties in which legal requirements are being violated and children are being harmed. (*Id.* ¶ 253.) The plaintiffs allege that the Wisconsin DHSS has failed to provide the Milwaukee County child-welfare system with the funding, support, and supervision that it needs to perform its duties adequately. (*Id.* ¶ 9.) It further alleges that the state has taken federal dollars which were made available to the state as reimbursement for Milwaukee foster care costs and diverted these funds to non-child welfare programs. (*Id.* ¶ 253.)

**C. Causes of Action Asserted**

Plaintiffs allege various constitutional and statutory claims against the State and County defendants under 42 U.S.C. § 1983, and also allege pendant state law claims. First, they allege that all of the defendants have deprived the plaintiff children of rights conferred upon them by the First, Ninth and Fourteenth Amendments to the United States Constitution. They next allege the deprivation of rights conferred upon them by the Federal Adoption Assistance and Child Welfare Act and the Federal Child Abuse Prevention and Treatment Act. They also allege that those plaintiff children who are handicapped or disabled have been deprived of their rights under the Americans with Disabilities Act and the Rehabilitation Act of 1973. Further, the plaintiffs allege that the defendants have deprived them of rights conferred upon them by the State's Children's Code, state regulations, and the Wisconsin Constitution. (*Id.* ¶¶ 260–264.)

**D. Injuries Alleged**

The plaintiffs go on to allege that, as a result of the defendants actions, the plaintiff children, the other approximately 4000 children[2] in the custody of Milwaukee County

---

**2.** The complaint estimated the number at 5000, but the class certification motion estimated the number at 4000.

DHS, and children who the Department knows or should know are abused or neglected, are being irreparably harmed and deprived of the opportunity for safe and healthy childhoods. (*Id.* ¶ 259.)

### E. Relief Requested

The plaintiffs seek class certification so that they can represent the class, and they ask the court to enter "declaratory and injunctive relief necessary and appropriate to remedy the defendants' violations of the plaintiffs' rights" under the United States Constitution, Federal laws and Wisconsin State laws. (*Id.* ¶ 265.)

### III. STATE DEFENDANTS' MOTION TO DISMISS

The Governor and the Secretary of the Wisconsin DHSS have moved to dismiss plaintiffs' claims against them on the grounds that none of the allegations state claims against them, and that some of allegations are barred by the Eleventh Amendment of the United States Constitution. Parts A and B of this Section of the decision briefly explore the standards for motions to dismiss and the Eleventh Amendment issue. Part C discusses each constitutional and federal claim brought under Section 1983.

### A. The Standard for Dismissal

In considering a motion to dismiss, this court must accept as true all well-pleaded factual allegations in the complaint, drawing all reasonable inferences in favor of the plaintiff. *Hishon v. King & Spalding,* 467 U.S. 69, 72, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984); *Yeksigian v. Nappi,* 900 F.2d 101, 102 (7th Cir.1990). The court may dismiss a complaint under Fed.R.Civ.P. 12(b)(6) for failure to state a claim "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon,* 467 U.S. at 73, 104 S.Ct. at 2232. Although all reasonable inferences are to be drawn in favor of the plaintiff, the complaint must set forth factual allegations sufficient to establish the elements that are crucial to recovery under plaintiff's claim. *Sutliff, Inc. v. Donovan Cos., Inc.,* 727 F.2d 648, 654 (7th Cir.1984).

### B. Defendants' Eleventh Amendment Arguments are Mooted by Plaintiffs' Clarifications

The Eleventh Amendment to the United States Constitution states:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

Eleventh Amendment jurisprudence flows more from caselaw than from the language of the Amendment. The Amendment has been interpreted to prohibit a federal court from ordering state officials to conform their conduct to state law. *Pennhurst State Sch. and Hosp. v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). In their complaint, the plaintiffs lump the State defendants and County defendants together when listing the causes of action "against the defendants," including causes of action brought under state statutes. Thus, the State defendants naturally thought that the complaint attempted to bring state law claims against the State defendants. But in their briefs, the plaintiffs have clarified their position to explain that they do not bring state law claims against the State defendants.

■ Generally, suits against state officials acting in their official capacities are barred because they are not different from suits against the state itself, and *Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1988) tells us that states may not be sued under § 1983 because they are not proper "persons" to be sued under the state and they receive Eleventh Amendment immunity. The exception to the rule is that state officials can be sued in their official capacities for prospective injunctive or declaratory relief and monetary damages ancillary to either. *Id.* at 71 n. 10, 109 S.Ct. at 2312 n. 10; *Kentucky v. Graham,* 473 U.S. 159, 169 n. 18, 105 S.Ct. 3099, 3107 n. 18, 87 L.Ed.2d 114 (1985). Thus, the State defendants are correctly included as "persons" under the plaintiffs' claims for prospective injunctive relief in this case.

These clarifications make the defendants' motion to dismiss pursuant to the Eleventh

Amendment to the United States Constitution moot, and for that reason, the motion shall be DENIED.

### C. Constitutional and Statutory Claims Brought Under Section 1983

Section 1983 imposes liability on a person who, acting under color of state law, "subjects or causes to be subjected" a plaintiff to a deprivation of a right created by the Constitution or federal law. The plaintiff children claim that the State defendants, in addition to the County defendants, have deprived them of their rights created by the Fourteenth Amendment to the Constitution, the Adoption Assistance and Child Welfare Act, the Child Abuse Prevention Act, the Americans with Disabilities Act, and the Rehabilitation Act.

### 1. Constitutional Claims Against the State Defendants

■ As their first cause of action, the plaintiff children who are in the foster-care custody in Milwaukee County [3] allege that the State defendants have breached affirmative constitutional duties arising from their custodial circumstances and judicially inferred under the Due Process Clause of the Fourteenth Amendment of the United States Constitution. The State defendants acknowledge that the plaintiffs may have colorable constitutional claims against the County defendants. In fact, although the Constitution does not generally require governments to act affirmatively to provide services and care, certain affirmative duties arise from the Constitution when a "special relationship" exists between the plaintiff and the government. That special relationship is when the plaintiff is in the government custody. *See DeShaney v. Winnebago County Dep't. of Soc. Serv.,* 489 U.S. 189, 200–201, 109 S.Ct. 998, 1005–06, 103 L.Ed.2d 249 (1989) (a state's unwillingness or inability to protect child from father's serious and continuous abuse did not violate child's substantive due process rights because child not in state custody); *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) (involuntary commitment to a state institution for the mentally impaired gives rise to constitutional rights to services and care from the state).[4] In *Youngberg,* the Supreme Court held that the Due Process Clause of the Fourteenth Amendment guarantees those who are brought into the custody of the state the right to safe conditions of confinement, freedom from undue bodily restraint, and, for those who need it, "minimally adequate or reasonable training to ensure safety and freedom from undue restraint." 457 U.S. at 319, 102 S.Ct. at 2459–60. The *Youngberg* court held that liability may be imposed when the decisions regarding the safety and freedom of those in custody are not based upon the exercise of professional judgment. *Id.*

■ While the Supreme Court has never decided the issue, the Seventh Circuit has ruled that a child placed in foster care—at least one involuntarily placed in foster care—has a relationship with the government that gives rise to *Youngberg's* affirmative duties. *See, e.g., K.H. v. Morgan,* 914 F.2d 846 (7th Cir.1990) (foster children have substantive due process right to be free from harm while in foster care).[5] This court will not rule on

---

**3.** The children in the class who are not in foster-care custody but who allegedly "may be or have been abused or neglected and are or should be known to [the defendants]" (Compl. ¶ 1), acknowledge in their brief that they do not and cannot assert breaches of affirmative constitutional duties. *See DeShaney v. Winnebago County Dep't. of Soc. Serv.,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989).

**4.** The *DeShaney* Court explained:

The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf. In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the "deprivation of liberty" triggering the protections of the Due Process Clause....

489 U.S. 189, 200, 109 S.Ct. 998, 1005–06 (citations omitted).

**5.** *See also Norfleet v. Arkansas Dep't. of Human Servs.,* 989 F.2d 289, 291–93 (8th Cir.1993); *Yvonne L. v. New Mexico Dept. of Human Servs.,* 959 F.2d 883, 890–93 (10th Cir.1992); *Meador v. Cabinet for Human Resources,* 902 F.2d 474, 476 (6th Cir.), *cert. denied,* 498 U.S. 867, 111 S.Ct. 182, 112 L.Ed.2d 145 (1990) (right to be free

the parameters of the constitutional duties imposed upon the County and State defendants in this case, for they have not been briefed or argued. Instead, the focus thus far in this case has been on whether the State defendants are liable for some or all of the Constitutional transgressions of the County defendants, who have primary foster care custody of the children. The plaintiffs rest their constitutional claims against the State defendants on the theory that the Governor and the Secretary of the Wisconsin DHSS have "supervisory liability" for constitutional violations committed by the County defendants. To support this claim, the children allege that the State defendants are responsible for the policies and practices carried out by Milwaukee County DHS. The children point to the state governmental structure, to state and federal statutes requiring the State DHSS to devise and oversee foster care policies, and to federal funding statutes which give money to the State of Wisconsin on the condition that State officials fulfill certain obligations toward Wisconsin foster children, including supervising foster care programs.

■ Although there is no respondeat superior liability under Section 1983, supervisory liability satisfies the causation requirement of Section 1983 when supervisory officials who have not been directly involved in the deprivation itself fail to take action which they are required to take to stop the violations of their subordinates in a manner which amounts to deliberate indifference to the rights of persons with whom the subordinates come in contact, or when they create policies and practices pursuant to which the constitutional deprivation was carried out. *City of Canton v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412 (1989) (municipality can be liable for failure to train municipal employees); *Monell v. New York City Dept. of Soc. Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1977).[6] The allegations of the complaint which the plaintiffs assert give rise to a claim for the State defendants' supervisory liability include: (1) the Secretary of Wisconsin DHSS "is responsible for the policies, practices, and operation of social services agencies in the state and for ensuring compliance by those agencies with applicable provisions of state and federal law" (*Id.* ¶ 50); (2) the Governor "is responsible for ensuring that government agencies in the state operate in compliance with applicable provisions of state and federal law" (*Id.* ¶ 49); (3) the State defendants have long known of the systematic failures of Milwaukee foster care (*Id.* ¶ 253); and (4) despite knowing of the continuing irreparable damage being caused to the plaintiff children damaged by this failure to provide mandated services and protection, the defendants (including the State defendants) have failed and refused to take necessary action. (*Id.* ¶ 259.) The plaintiffs have also alleged that the State defendants have taken federal dollars which were made available to the state as reimbursement for Milwaukee foster care costs and diverted these funds to non-child welfare programs—an allegation that implies a deliberate breach of responsibility. (*Id.* ¶ 253.) The State defendants have conceded that Milwaukee County is an entity of the State of Wisconsin, and that the state conducts a review of the Milwaukee County foster care system every three years, in conjunction with the federal government.

Supervisory liability under Section 1983 most often applies within a jurisdiction (a municipality is liable when it authorizes the use of excessive force by its police officers, for instance). But the plaintiffs in this matter have made allegations of grossly inadequate services on a County level, and have alleged that the State defendants knew of these inadequacies, had the authority to ame-

---

from infliction of unnecessary harm); *accord Doe v. New York City Dep't. of Soc. Servs.,* 649 F.2d 134 (2d Cir.1981); *cert. denied,* 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983); *Taylor v. Ledbetter,* 818 F.2d 791, 797 (11th Cir.1987), *cert. denied,* 489 U.S. 1065, 109 S.Ct. 1337, 103 L.Ed.2d 808 (1989); *Aristotle P. v. Johnson,* 721 F.Supp. 1002, 1008–10 (N.D.Ill.1989) (substantive due process right to safe custody).

6. *See also, Pembaur v. Cincinnati,* 475 U.S. 469, 483, 106 S.Ct. 1292, 1300, 89 L.Ed.2d 452 (1986) (supervisory liability may attach where supervisory officials are responsible for establishing employment policy).

liorate or to attempt to ameliorate them, refused to exercise that authority, and in fact made the inadequacies worse by diverting funds earmarked for the County foster care system. With the plaintiffs alleging systematic and widespread constitutional violations, the State defendants shall not be allowed to wash their hands of their alleged responsibilities. *See Jensen v. State Bd. of Tax Comm'rs,* 763 F.2d 272, 281 (7th Cir.1985) (when a state's actions utterly obstruct a county's attempts to meet its constitutional duties, such conduct alone might violate the Constitution).

In addition to the factual allegations of responsibility, the plaintiffs have pointed to the Wisconsin Children's Code and the structure of federal funding statutes which condition funding on supervisory actions in the area of foster care to support the theory that the State defendants owe a duty to supervise the County's foster care system. While this decision has already noted that the *Pennhurst* doctrine bars the plaintiffs from bringing claims against the State defendants under the Wisconsin Children's Code, the plaintiffs may use the statute to explain the structure of responsibility for foster care in Wisconsin to show supervisory responsibility for civil rights violations brought under the United States Constitution, even though the terms of the statute itself cannot be enforced against the State defendants in this court.

The Wisconsin Children's Code, Section 48.48, describes the authority of Wisconsin DHSS under the chapter:

The [Wisconsin DHSS] shall have authority:

(1) to promote the enforcement of the laws relating to delinquent children, nonmarital children and children in need of protection or services including developmentally disabled children and to take the initiative in all matters involving the interests of such children where adequate provision therefor is not made. This duty shall be discharged in cooperation with the courts, county departments, licensed child welfare agencies and with parents and other individuals interested in the welfare of children.

(2) To assist in extending and strengthening child welfare services with appropriate federal agencies and in conformity with the federal social security act and in cooperation with parents, other individuals and other agencies so that all children needing such services are reached.

(3) To accept legal custody of children transferred to it by the court under s. 48.355 and guardianship of children when appointed by the court, and to provide special treatment and care when directed by the court. . . .

(4) To provide appropriate care and training for children in its legal custody or under its supervision. . . .

The Children's Code also gives Wisconsin DHSS the authority to promote its enforcement, Wis.Stat. § 48.48(1); the authority to promulgate rules governing permanency planning for children in foster care under supervision of state, county or independent child welfare agencies, *id.* § 48.38(6); the authority to promulgate rules establishing standards for the operation of county departments, as well as child welfare agencies, day care centers, foster homes, group homes, and shelter care facilities, *id.,* § 48.67(1); and requires that the counties report to Wisconsin DHSS on cases of suspected child abuse or neglect. *Id.* § 48.981(3)(c)(8).

In addition to chapter 48, chapter 46 of the Wisconsin statutes sets out the responsibilities for the Wisconsin DHSS for social services generally. Wis.Stat. § 46.206(1)(a) requires Wisconsin DHSS to "supervise the administration of social services" and to "submit to the federal authorities state plans for the administration of social services. . . ." The chapter requires Wisconsin DHSS to "develop standards for the development and delivery of social services under [the Children's Code]." Wis.Stat. § 46.26(1). Further, Wis.Stat. 46.03(7) requires the Wisconsin DHSS to "take the initiative in all matters involving the interests of" children adjudged to be in need of protective services "where adequate provision therefor has not already been made, including the establishment and enforcement of standards for services provided [under the Children's Code]." Wis.Stat. 46.16(1) requires the Wisconsin

DHSS to investigate and supervise shelter care facilities for children. Wisconsin DHSS may also "license and revoke licenses of and exercise supervision over all child welfare agencies" and the placement of children in foster homes, inspect each agency's records, and visit all foster homes in which children are placed. Wis.Stat. 46.16(2). Finally, the chapter allows the Wisconsin DHSS to audit county records and review contracts made between county departments and public or voluntary agencies for services. Wis.Stat. §§ 46.206(1)(c), 46.215(2)(c).

In 1980, this court found that the Wisconsin Children's Code demonstrated that Wisconsin "DHSS had a duty under the law to act in conjunction with local agencies to fulfill the intent of the legislature." *Roe v. Borup,* 500 F.Supp. 127 (E.D.Wis.1980).[7] In that case, the plaintiffs alleged that the county and state defendants had taken a minor child away from her parents without constitutionally adequate process. *Id.* at 130. The plaintiffs alleged that the Wisconsin DHSS had failed to promulgate rules and guidelines to prevent the denial of procedural due process rights by counties seeking to remove children from the custody of their natural parents, necessarily implying that the state regulations permitted counties to effect the unconstitutional deprivation of the parents' custodial rights.

Further, the plaintiff children have pointed to the federal Adoption Assistance and Child Welfare Act and the Child Abuse Prevention and Treatment Acts to support their allegations that the State defendants receive federal monies for the foster care program, and are supposed to turn some of that money over to Milwaukee County to implement the foster care program within the federal constitutional, statutory, and regulatory mandates. These statutes shall be discussed more fully in the following Parts if this decision. For purposes of the Section 1983 claims brought pursuant to the Constitution, it suffices to say that by taking federal money, the State defendants have assumed the responsibility for the foster care programs administered in Wisconsin—even if they would prefer to pass the responsibility on to the County.

Finally, the courts of Wisconsin have long held that counties are "creature[s] of the state and exist in large measure to help handle the state's burdens of political organization and civil administration." *State v. Mutter,* 23 Wis.2d 407, 413, 127 N.W.2d 15 (1964). The county is created by the state, "not by virtue of its own will or consent, but as a result of the superimposed will of the state." *Kyncl v. Kenosha County,* 37 Wis.2d 547, 554, 155 N.W.2d 583 (1968) (contrasting cities, which are created for the local convenience of the inhabitants) (quoting *State v. Schinz,* 194 Wis. 397, 400–01, 216 N.W. 509 (1927)). In rejecting an analogy to the federal-state relationship (an analogy that the State defendants in this case made in a "slippery-slope" argument that if this court allowed the plaintiffs to sue the State defendants for supervisory liability, it would have to allow them to sue federal officials as well), the Supreme Court of the United States has said:

> Political subdivisions of States—counties, cities, or whatever—never were and never have been considered as sovereign entities. Rather, they have been traditionally regarded as subordinate governmental instrumentalities created by the State to assist in the carrying out of the state governmental functions.... [T]hese governmental units are "created as convenient agencies for exercising such of the governmental powers of the State as may be entrusted to them," and the "number, nature and duration of the powers conferred upon [them] ... and the territory over which they shall be exercised rests in the absolute discretion of the State."

7. Other courts have also looked to state law to determine the relationship between actors in civil rights actions. *See Soderbeck v. Burnett County, Wis.,* 752 F.2d 285, 293 (7th Cir.1985) (looking to Wisconsin state law to determine accountability for County sheriff); *Thomas S. v. Morrow,* 781 F.2d 367 (4th Cir.1986) (looking to North Carolina state law to determine the relationship between the State Secretary and local authorities); *Jensen v. State Bd. of Tax Comm'rs of State of Ind.,* 763 F.2d 272, 280–81 (7th Cir.1985) (county could not argue that state of Indiana was directly responsible for the existence—and therefore the elimination—of unconstitutional conditions in county jail because no proof of agency relationship between county and state).

*Reynolds v. Sims,* 377 U.S. 533, 575, 84 S.Ct. 1362, 1388, 12 L.Ed.2d 506 (1963) (citations omitted).[8]

Thus, nothing in the legal nature of the county-state relationship recognized by the Courts of Wisconsin or the federal and state statutes governing the foster care system sustains the State defendants' burden on its motion to dismiss. In other words, the State defendants have failed to prove to that the allegations of the complaint could not possibly support a § 1983 claim against the State defendants for violating the Milwaukee County foster children's Fourteenth Amendment rights. Although the direct provider of foster care services in Milwaukee County is the Milwaukee County DHS,[9] the claims against the State defendants shall not be dismissed given the nature and breadth of the allegations of state responsibility for constitutional violations and the structure of foster care in the State of Wisconsin. The motion to dismiss the complaint's allegations of constitutional deprivations against the State defendants is DENIED.

### 2. Adoption Assistance and Child Welfare Act Claims

The plaintiffs also allege that the State and County defendants have violated their civil rights by violating the Adoption Assistance and Child Welfare Act (the "Adoption Assistance Act"), which is found in parts IV–B[10] and IV–E[11] of the Social Security Act. The Adoption Assistance Act creates a cooperative federal-state program under which the federal government provides those states which opt to participate with funding for child welfare programs. Part IV–B of the Adoption Assistance Act provides federal funds to states to assist them in developing a broad range of child-welfare service programs, including foster care. Part IV–E establishes a separate program with separate appropriations through which Congress provides funds to states to cover child-specific foster care and adoption expenses incurred by the states.

■ The State defendants posit that the plaintiffs do not have a private right of action under the Adoption Assistance Act to remedy their complaints about the foster care system in Milwaukee County. Federal funding statutes such as the Adoption Assistance Act create enforceable rights under Section 1983 if the statutes themselves created enforceable rights, privileges or immunities. *Wright v. Roanoke Redevelopment and Housing Authority,* 479 U.S. 418, 423, 107 S.Ct. 766, 770, 93 L.Ed.2d 781 (1987); *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 508, 110 S.Ct. 2510, 2516–17, 110 L.Ed.2d 455 (1990). In 1981, the Supreme Court issued its keystone decision addressing the conditions under which a federal funding statute creates enforceable rights in *Pennhurst State Sch. & Hosp. v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). Factors to examine include: (1) whether "the provision in question was intended to benefit the putative plaintiff[s]"; (2) whether the provision reveals a congressional preference or a binding obligation; and (3) whether the plaintiff asserts an interest which is so "vague and amorphous" that it is "beyond the compe-

---

**8.** However, the Seventh Circuit has found that Indiana counties are not so financially intertwined with States as to be able to assert Eleventh Amendment immunity from damages suits. *Baxter v. Vigo County Sch. Corp.,* 26 F.3d 728, 732 (7th Cir.1994) (citing cases).

**9.** Chapter 46 indicates that, in a county, such as Milwaukee County, with a population of 500,000 or more "the administration of welfare services is vested in a county department of social services." In fact, Wis.Stat. § 48.57 defines the broad powers and duties of county departments in providing child welfare services in Milwaukee County:

(1) Each county shall administer and expend such amounts as may be necessary out of any moneys which may be appropriated for child welfare purposes by the county board of supervisors or donated by individuals or private organizations.

In addition, the County has the authority to, *inter alia,* investigate instances in which children may be in need of protection and offer services to the caretakers of the children; to accept legal custody of children transferred to the county by the court under § 48.355; and to provide appropriate protection and services for children in its care.

**10.** Entitled "Child Welfare Services" and codified in 42 U.S.C. §§ 620–28.

**11.** Entitled "Federal Payments for Foster Care and Adoption Assistance," and codified at 42 U.S.C. §§ 670–679a.

tence of the judiciary to enforce." *Wilder*, 496 U.S. at 509, 110 S.Ct. at 2517. Once the plaintiffs have pointed to a substantive provision of rights, privileges, or immunities, the defendants bear the burden of establishing that "Congress intended to preclude reliance on § 1983 as a remedy for the deprivation of a federally secured right." *Wright*, 479 U.S. at 423–34, 107 S.Ct. at 770–76 (quoting *Smith v. Robinson*, 468 U.S. 992, 1012, 104 S.Ct. 3457, 3468, 82 L.Ed.2d 746 (1984)). Courts "do not lightly conclude" such preclusion. *Id.*

In this case, the plaintiffs' complaint alleges that all of the defendants have deprived them of the following asserted "rights" under the Adoption Assistance Act:

● implementation of a pre-placement services program designed to help children remain with or be reunited with their families

● timely written case plans that contain specified elements and implementation and review of those plans

● planning and services that will assure "proper placement"; "appropriate services" in the "least restrictive most family-like setting"

● placement in foster homes that conform to nationally recommended standards; "proper care" while in custody

● regular judicial or administrative reviews

● dispositional hearings within eighteen months of entering custody

● services in a child-welfare system with an adequate information system.

(Compl. ¶ 261.) The briefs and arguments have clarified that the plaintiffs bring their Adoption Assistance Act claims under Section 671(a) of Part IV–E and Section 627 of Part IV–B.[12] The court shall next address the State defendants' claims that these sections do not create enforceable rights.

#### a. Claims under Title IV–E of the Adoption Assistance Act

■ First, the plaintiff children claim that defendants have violated the provisions of the Adoption Assistance Act located in Section 671(a) of Part IV–E of the Social Security Act. Section 671(a) requires that the state submit to the federal government a plan containing certain elements and mandates for the foster care system within the state. For example, the plan must mandate that "reasonable efforts will be made ... prior to the placement of a child in foster care, to prevent or eliminate the need for removal of the child from his home...." 42 U.S.C. § 671(a)(15). The state plan must also mandate a case review system, and require that foster homes or other facilities conform to national standards. *Id.* at § 671(a)(10) & (16).

Until 1992, some federal courts, including the Seventh Circuit, construed § 671(a)'s list of required plan elements to create private rights of action for children to enforce at least some of the specific mandated components of the plan. *See, e.g., Artist M. v. Johnson*, 917 F.2d 980, 986–89 (7th Cir.1990) *rev'd, Suter*, 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1.[13] For example the Seventh Circuit construed the Act's requirement that states' plans provide that "reasonable efforts" will be made to keep children in their homes or to return them as soon as possible, to mean that a child could sue the state under Section 1983 for failure to make such "reasonable efforts." *Artist M.*, 917 F.2d at 986–89 (construing § 671(a)(15) to provide a private right of action.) However, in 1992, the Supreme Court reversed the Seventh Circuit's decision in *Artist M.*, concluding that the reasonable efforts requirement of § 671(a)(15) was too vague to be judicially enforceable. *Suter v. Artist M.*, 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992). The Supreme Court also announced a new approach to federal funding statutes requiring plans, stating that the only private right arising from such statutes is a right to the

---

12. In their briefs, the plaintiffs mentioned that they alleged a claim under Section 677 of Title IV–E as well. They did not pursue this claim at oral argument, and the court shall DISMISS that claim at this time.

13. *See, also, Lynch v. Dukakis*, 719 F.2d 504, 509–14 (1st Cir.1983); *L.J. v. Massinga*, 838 F.2d 118, 122–23 (4th Cir.1988), *cert. denied*, 488 U.S. 1018, 109 S.Ct. 816, 102 L.Ed.2d 805 (1989).

plan itself, and not to the implementation of the plans' required provisions.

Since that time, the Seventh Circuit has expounded upon the *Suter* decision's applicability to other provisions in § 671(a), finding that under the *Suter* analysis of § 671(a)(15), other § 671(a) provisions do not create enforceable rights beyond the right to a qualifying state plan. *Clifton v. Schafer,* 969 F.2d 278, 283–85 (7th Cir.1992); *Procopio v. Johnson,* 994 F.2d 325 (7th Cir.1993). Recently, the Seventh Circuit explained that *Suter* had closed the door entirely to a Section 1983 action brought under a federal statute which merely conditions a "state's receipt of federal funds on the adoption of a plan satisfying certain criteria." *Miller v. Whitburn,* 10 F.3d 1315, 1319 (7th Cir.1993). However, the Seventh Circuit left the door slightly (although somewhat confusingly) ajar by stating that when a statute and its accompanying regulations set forth detailed factors to be considered in determining whether a state has complied with a portion of the statute, the beneficiaries of the statute may bring a Section 1983 cause of action. *Id.*

After these Seventh Circuit decisions were decided, Congress answered the Supreme Court's *Suter* decision by passing an amendment to the Social Security Act (of which the Adoption Assistance Act is a part) in October of 1994. The amendment states that in all pending and future actions:

> [B]rought to enforce a provision of the Social Security Act, such provision is not to be deemed unenforceable because of its inclusion in a section of the Act requiring a State plan or specifying the required contents of a State plan. This section is not intended to limit or expand the grounds for determining the availability of private actions to enforce State plan requirements other than by overturning any such grounds applied in *Suter v. Artist M.,* [503 U.S. 347], 112 S.Ct. 1360 [118 L.Ed.2d 1] (1992), but not applied in prior Supreme Court decisions respecting such enforceability; provided, however, that this section is not intended to alter the holding in *Suter v. Artist M.* that section 471(a)(15) [42 U.S.C. § 671(a)(15) ] of the Act is not enforceable in a private right of action.

42 U.S.C. 1320a–2 (amended October 20, 1994). In light of this amendment, this court finds (and the parties agree) that the narrow holding of *Suter* remains intact, and the plaintiffs claims under 42 U.S.C. § 671(a)(15) must be dismissed because the "reasonable efforts" language in that section is too "vague and amorphous." But the court must "rewind the clock" and look to cases prior to *Suter* to determine the enforceability of other provisions under the Adoption Assistance Act. More broadly, the amendment overrules the general theory in *Suter* that the only private right of action available under a statute requiring a state plan is an action against the state for not having that plan. Instead, the previous tests of *Wilder* and *Pennhurst* apply to the question of whether or not the particulars of a state plan can be enforced by its intended beneficiaries.

In *Wilder,* 496 U.S. 498, 110 S.Ct. 2510, the Supreme Court held that health care providers had an enforceable right to reasonable and adequate reimbursement rates by the state under the Boren Amendment to the Medicaid Act. The amendment required reimbursements at rates that a "State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities," 42 U.S.C. § 1396a(a)(13)(A). After finding that the providers were the intended beneficiaries of the amendment, the court held that Congress had imposed a binding obligation on states, giving rise to enforceable rights. *Id.* at 509–512, 110 S.Ct. at 2517–19. The Court said that Congress had worded the amendment in "mandatory rather than precatory" language, and provided that funding would be expressly conditioned on compliance with the amendment. *Id.* at 512, 110 S.Ct. at 2519.

Applying the first of the *Wilder* factors to this case, it is clear and undisputed that the children bringing this lawsuit are the intended beneficiaries of the Adoption Assistance Act. As for the second factor, Congress imposed a binding obligation by explicitly tying the creation of certain features of a state plan to federal funding. The scheme and the language of § 671(a) are mandatory,

and the theory of *Suter*—that when Congress sets out plan requirements the only enforceable right is to the plan itself, and not to its implementation—has been rejected by Congress itself—the body whose intentions must be interpreted. The second prong of *Wilder* is met. Finally, with the exception of § 671(a)(15), the provisions of § 671(a) are not too "vague and amorphous" that it is "beyond the competence of the judiciary to enforce." *Wilder*, 496 U.S. at 509, 110 S.Ct. at 2517. Section 671(a)(16), for example, requires that the state provide for the development of a case plan for each foster child and for a case review system meeting certain statutory requirements. Sections 671(a)(2), (3), (7) & (13) require reviews, monitoring, and collaboration between the state, local, and federal agencies. Section 671(a)(10) & (11) require that the state designate a state authority to establish, maintain, and review standards for foster family homes and child care institutions which are "reasonably in accord with recommended standards of national organizations concerned with the standard for such institutions or homes." These provisions are not vague, not amorphous, and certainly not beyond a court's ability to understand and to enforce.

The conclusion that Section 671(a) offers enforceable rights was widely recognized prior to *Suter*. *See L.J. v. Massinga,* 838 F.2d 118, 123 (4th Cir.1988), *cert. denied,* 488 U.S. 1018, 109 S.Ct. 816, 102 L.Ed.2d 805 (1989); *Lynch v. Dukakis,* 719 F.2d 504, 509–12 (1st Cir.1983); *LaShawn A. v. Dixon,* 762 F.Supp. 959, 987–89 (D.D.C.1991), *aff'd in part on other grounds,* 990 F.2d 1319 (D.C.Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 691, 126 L.Ed.2d 659 (1994). Although the Seventh Circuit's *Artist M.* holding that § 671(a)(15) was enforceable was overruled by *Suter,* the Seventh Circuit's reasoning was vindicated by Congress. The motion to dismiss the claim under § 671(a)(15) is GRANTED and the motion to dismiss the claims under other provisions of § 671(a) is DENIED.

**14.** The Act defines "case review system" to require individual case plans, reviews, and disposi-

### b. Claims under Title IV–B of the Adoption Assistance Act

■ The plaintiffs also claim violations of the Adoption Assistance Act under Sections 627(a)(2) and 627(b)(3) of Title IV–B of the Social Security Act. Neither the Supreme Court nor the Seventh Circuit has passed upon the enforceability of these sections under Section 1983.

Section 627(a)(2) provides, in relevant part, that if Congress allocates in excess of $141,-000,000 under Part IV–B of the Social Security Act, a state may not qualify for funding over-and-above the amount it would be eligible for if the appropriation were only $141,-000,000 unless the state:

> (2) has implemented and is operating to the satisfaction of the Secretary—

> > (A) a statewide information system from which the status, demographic characteristics, location, and goals for the placement of every child in foster care or who has been in such care within the preceding twelve months can readily be determined;

> > (B) a case review system (as defined in section 475(5) [42 USCS § 675(5)[14]]) for each child receiving foster care under the supervision of the State; and

> > (C) a service program designed to help children, where appropriate, return to families from which they have been removed or be placed for adoption or legal guardianship.

42 U.S.C. § 627(a). Subsection (b) of the statute warns that if Congress appropriates $325,000,000 or more under the Adoption Assistance Act for two consecutive fiscal years, each state shall have its allotment reduced to 1979 levels unless the state:

> (1) has completed an inventory of the type specified in subsection (a)(1);

> (2) has implemented and is operating the program and systems specified in subsection (a)(2); and

tional hearings. 42 U.S.C. § 675(5).

(3) has implemented a pre-placement preventive service program designed to help children remain with their families.

42 U.S.C. § 627(b).

Prior to the Congressional rejection of the analysis of *Suter*, the State defendants argued that the claim brought pursuant to this statute must be dismissed because, under the theory of *Suter*, the language of Section 627(a)—"to the satisfaction of the Secretary"—only mandates that the Secretary be satisfied, and does not mandate that funded states create and maintain information systems, case review systems, and service programs designed to return children to their families when appropriate, or allow for adoption. However precarious this argument may have been prior to the amendment, it must be swept away now, in favor of the three-factor *Wilder* analysis.

Again, the first prong of the *Wilder* test is indisputably met—§ 627 was meant to benefit the child-plaintiffs in this matter. Applying the second prong of the *Wilder* test is not quite as simple. That Congress used mandatory not precatory language is very apparent, for Congress made it clear that if Wisconsin fails to implement and operate a satisfactory information system, case review system, and service program for family preservation and adoption placements, Wisconsin will lose any extra federal funding to which it might otherwise be entitled. The defendants argue, however, that even if the language is mandatory, the funding scheme gives rise to an inference that Congress was merely espousing its preferences for state action in this statute. For example, the defendants point out that states do not lose their funding altogether if they fail to implement the enumerated procedures. In fact, if Congress has appropriated less that $141,000,000, the states do not even get their share reduced if they do not have case review systems and informational systems in place. Further, the defendants say, extra funding might easily amount to only a very small portion of the amount necessary to implement the listed services, and therefore the Congress could not possibly have meant to mandate those services. Not so. Congress made it clear that if Wisconsin wants to receive extra mon-

ey, it must create and provide certain services. *See Pennhurst*, 451 U.S. at 24, 101 S.Ct. at 1543 ("Congress must express clearly its intent to impose conditions on the grant of federal funds so that the States can knowingly decide whether or not to accept those funds.")

Further, the plaintiffs' claims under Section 627 assert interests which are not so "vague and amorphous" as to be "beyond the competence of the judiciary to enforce." *Wilder*, 496 U.S. at 509, 110 S.Ct. at 2517. It is well within the court's ability to determine whether the Wisconsin DHSS has created a statewide information system from which the status, demographic characteristics, location, length of time in the system, and goals for the placement of every child in foster care, can readily be determined; whether a case review system is in place for each child receiving foster care under the supervision of the state; and whether there is a service program designed to help children, where appropriate, return to families from which they have been removed or be placed for adoption or legal guardianship. As a final consideration, neither by word nor by the creation of an enforcement system has Congress indicated that it precludes the use of a private enforcement of § 627.

Therefore, the plaintiff children shall be allowed to proceed against the State defendants under § 627 of the Adoption Assistance Act, and the motion to dismiss those claims shall be DENIED.

### 3. Child Abuse Prevention and Treatment Act Claims

■ The plaintiffs also sue under the federal Child Abuse Prevention and Treatment Act ("CAPTA"), which focuses upon the protection of all of our nation's children, including those who have come in contact with the foster care system. *See* 42 U.S.C. §§ 5101 et. seq. CAPTA establishes the National Center for Child Abuse and Neglect, an Advisory Board on Child Abuse and Neglect, an Inter–Agency Task Force on Child Abuse and Neglect, and a National Clearinghouse for information relating to child abuse. 42 U.S.C. §§ 5101–5104. It also provides for ongoing grants and technical assistance to eligible states for child abuse and neglect

prevention and treatment programs, as well as grants to states for programs relating to the investigation and prosecution of child abuse cases. 42 U.S.C. § 5106(a)-(c). CAPTA sets out certain requirements for each grant. For instance, in order to be eligible for grants to assist in "developing, strengthening, and carrying out child abuse and neglect prevention and treatment programs," states must:

> provide that upon receipt of a report of known or suspected instance of child abuse or neglect an investigation shall be initiated promptly to substantiate the accuracy of the report, and, upon a finding of abuse or neglect, immediate steps shall be taken to protect the health and welfare of the abused or neglected child and of any other child under the same care who may be in danger of abuse or neglect.

*Id.* § 5106a(b)(2). Further, the statute requires any state receiving funds to "demonstrate that there are in effect throughout the State," procedures, personnel, facilities, and programs and services "as may be necessary or appropriate to ensure that the state will deal effectively with child abuse and neglect cases in the State." *Id.* § 5106a(b)(3). The section goes on, however, to allow the appropriation of grant moneys to states who are not "eligible" but who are making good faith efforts to conform. *See Id.* § 5106a(c).

The plaintiffs alleged that the defendants violated CAPTA § 5106(b) because "[m]any children are left ... in dangerous ... situations" resulting from "inadequate child abuse investigation or the failure to offer services." (Compl. ¶ 211.) They allege that Milwaukee County has insufficient staff, and that the "Milwaukee DHS routinely fails to follow applicable law and reasonable professional standards with regard to the investigation of child abuse and neglect reports and the provision of services in connection with those reports." *See Id.* ¶¶ 219–20. For instance, the Milwaukee County DHS allegedly knew or should have known that Aline H. and Douglas and Maurice R. were in danger of physical and sexual abuse but "failed to protect these children from the abuse they suffered, which has resulted in serious emotional trauma for these children." (Compl. ¶ 73).

Also, despite having three of Patricia S.'s siblings in its custody, Milwaukee County DHS left the then six-year old in a dangerous situation, what a Department report described as a "filthy, unfurnished attic of a drug house [into which Patricia's mother] wanted to bring in men for drugs." (*Id.* ¶¶ 184–85.)

Although the plaintiffs have cited no cases holding that CAPTA creates enforceable rights, they rely upon an analogy to *Wilder*, 496 U.S. 498, 110 S.Ct. 2510. Like the statute in *Wilder*, CAPTA expressly conditions receipt of federal funding upon compliance with its provisions. *Id.* at 512, 110 S.Ct. at 2518–19; 42 U.S.C. § 1396(c). Congress used mandatory language when it said that "[i]n order for a State to qualify for a grant under subsection (a) [of this section], such State *shall* ... provide that upon receipt of a report ... and upon a finding of abuse or neglect, immediate steps *shall* be taken to protect...." 42 U.S.C. § 5106a(b) (emphasis added). Further, this language is not so vague and amorphous as to be nonjusticiable. Therefore, the plaintiffs shall be allowed to proceed with their civil rights claim under 42 U.S.C. § 5106a(b), and the State defendants' motion to dismiss this claims shall be DENIED.

### 4. Rehabilitation Act & Americans with Disabilities Act Claims

■ The Americans with Disabilities Act (ADA) provides that "no qualified individual with a disability shall, by reason of such disability, be ... denied the benefits of the services, programs, or activities of a public entity." 42 U.S.C. § 12132. Similarly, § 504 of the Rehabilitation Act mandates in relevant part that "[n]o otherwise qualified [handicapped individual] ... shall, solely by reason of her or his [handicap], ... be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794.

The plaintiffs have failed to state claims under the ADA and Rehabilitation Act because they have not sufficiently alleged that any of the individual plaintiffs are disabled as defined under those acts. The failure to so allege is fatal to the complaint's claims

against the State defendants, which shall be DISMISSED for failure to state a prima facie case.

## IV. CLASS CERTIFICATION

 The plaintiffs have filed a motion to certify this matter as a class action, with the class being defined as:

(1) the approximately 4000 children who, as the result of an allegation of abuse or neglect, of suspected abuse or neglect, or of voluntary placement by their parents, are in the legal and/or physical custody of the Milwaukee County Department of Human Services ["DHS"] and

(2) the thousands of children who are not in the Department's legal or physical custody but have been the victims of neglect or abuse of which the Department knows or should know or are at risk of neglect or abuse of which the Department knows or should know.

A party seeking class action certification must first meet the prerequisites identified in Fed.R.Civ.P. 23(a). That section provides that one or more members of a class may sue on behalf of the class if the class is so numerous that joinder of all members of the class is impractical, if questions of fact or law are common to the class members, if the claims of the proposed class representatives are typical of those of the class, and if the class representatives will protect the interests of the class fairly and adequately. Fed. R.Civ.P. 23(a).

With thousands of potential class members, the plaintiffs have met the requirement of numerosity. *See, e.g., Boles v. Earl,* 601 F.Supp. 737, 745 (E.D.Wis.1985). The defendants have not disputed this fact.

Additionally, while the members of the purported class do not share every question of law or fact, they all challenge the operating practices of the Milwaukee County foster-care system, and generally allege that the Milwaukee County foster-care program is systematically depriving children of their legal rights. Related to the requirement of

commonality is the requirement that the named parties be typical of the claims or defenses of the class. *See Eggleston v. Chicago Journeymen Plumbers' Local Union 130,* 657 F.2d 890, 895 (7th Cir.1981). Both elements require a commonality of grievances so that the case is both manageable and not plagued with internal conflicts of interests among class members.

The State defendants have expressed a concern that the breadth of the plaintiffs' claims may result in inherent conflicts among the interests of the class members, likely to preclude certification of a single class.[15] The State defendants do not, however, request a denial of class certification, or request an order directing separate actions alleging separate theories of relief. Instead, they request that the court define various subclasses, although they do not suggest the definitions of those classes.

Because the plaintiffs seek solely injunctive relief to remedy violations in a foster-care system in which the named plaintiffs and the putative class members are similarly enmeshed, the court will create only two subclasses at this time. Those subclasses will follow the natural division already apparent in the plaintiffs' proposed definition of the putative class: those children who are in Milwaukee County DHS foster care custody and those children for whom the Department has received reports of neglect or abuse but who are not in Milwaukee County DHS foster care custody.

The affidavits indicate that the representative parties will fairly and adequately protect the interests of the class under Fed.R.Civ.P. 23(a)(4). The plaintiffs are represented by attorneys of the Children's Rights Project of the American Civil Liberties Union—an organization with considerable experience in complex, child-welfare litigation. Plaintiffs' counsel are more than adequate, and have already shown their ability to prosecute this action vigorously on behalf of the putative class. Moreover, each of the named plaintiff

---

**15.** For instance, the proposed class includes children claiming a right to removal from their biological families, as well as children claiming a right to remain with their biological families. It also lumps plaintiffs who seek "preplacement preventative services" for keeping the family together, with those who complain that the county fails to "free" children for adoption by commencing proceedings for the termination of foster children's natural parent's parental rights.

children has an adult "next friend" serving to protect their interests in the lawsuit. Most of these next friends are attorneys who have been court-appointed counsel for the named plaintiffs in proceedings before the Milwaukee County Children's Court, social workers who work with those attorneys, or, in the case of four of the named plaintiffs, prominent members of the Milwaukee community who have a demonstrated interests in children's issues.[16]

■ An action that satisfies the four prerequisites of Rule 23(a) must then fall into one of the three categories of actions described in section (b) of the Rule. The plaintiff children seek to proceed under the second category, which applies to cases in which:

> the party opposing the class has acted or refused to act on grounds generally applicable to the class thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

Fed.R.Civ.P. 23(b)(2). Civil rights cases seeking broad declaratory or injunctive relief for a large and amorphous class, such as the one in this case, fall squarely into the category of class actions authorized by this section. *See* 1 H. Newberg, Newberg on Class Actions § 4.11, at 291 (2d ed. 1985); Notes of Advisory Committee on Rules, 1966 Amendments, 39 F.R.D. 69, 102 (1966).

For all of the foregoing reasons, this court will certify the class and create two subclasses defined as follows:

(1) children who are in foster care custody in Milwaukee County and who come into foster care custody in Milwaukee County; and

(2) children who are not in foster care custody in Milwaukee County, but about whom the County Department of Human Services has received reports of abuse or neglect, and children who become the object of such reports.

**FOR THE FOREGOING REASONS, IT WAS THEREFORE ORDERED ON FEBRUARY 3, 1995 AND FEBRUARY 16,** 1995: that the State defendants' motion to dismiss was GRANTED IN PART AND DENIED IN PART as follows:

1. The State defendants' motion to dismiss the constitutional claims against them was DENIED.

2. The State defendants' motion to dismiss the plaintiffs' claims under 42 U.S.C. § 671(a) was GRANTED as to § 671(a)(15) and DENIED as to all other parts.

3. The State defendants' motion to dismiss the plaintiffs' claims under 42 U.S.C. § 677 was GRANTED.

4. The State defendants' motion to dismiss the plaintiffs' claims under 42 U.S.C. § 627 was DENIED.

5. The State defendants' motion to dismiss the plaintiffs' claims under 42 U.S.C. § 5106a(b) was DENIED.

6. The State defendants' motion to dismiss the plaintiffs' claims under the Rehabilitation Act and the Americans with Disabilities Act was GRANTED as to the State defendants.

**IT WAS FURTHER ORDERED** that the plaintiffs' motion to certify the class is GRANTED, and two subclasses was be certified as follows:

(1) children who are in foster care custody in Milwaukee County and who come into foster care custody in Milwaukee County; and

(2) children who are not in foster care custody in Milwaukee County, but about whom the County Department of Human Services has received reports of abuse or neglect, and children who become the object of such reports.

---

16. *See* Affs. of Next Friends, attached as Exs. 13– 24 of Pls. Br. in Support of Class Cert.