JEANINE B., by her next friend, Robert BLONDIS, et. al., Plaintiff(s),

v.

Tommy G. THOMPSON, et al., Defendant(s).

No. 93–C–547.

United States District Court, E.D. Wisconsin.

June 9, 1997.

Christopher T. Dunn, New York Civil Liberties Union, New York City, Peter M. Koneazny, American Civil Liberties Union, Milwaukee, WI, Marcia Robinson–Lowry, Daniel S. Dorsky, Martha Stone, Mark G. Peters,

Children's Rights, Inc., New York City, for Plaintiffs.

Peter C. Anderson, Mary Woolsey Schlaefer, Wisconsin Dept. of Justice, Madison, WI, John F. Jorgensen, Milwaukee County Corp. Counsel, Milwaukee, WI, for Defendants.

### DECISION AND ORDER

RANDA, District Judge.

This matter comes before the Court on plaintiffs' motion for a preliminary injunction requesting that the defendants be directed to make certain changes in the Milwaukee County Child Protective Services Unit. The motion is based upon plaintiffs' claims under the Child Abuse Prevention and Treatment Act ("CAPTA"). In their respective responses, defendants ask the Court to reconsider Judge Reynolds' prior decision finding that CAPTA is enforceable in a private action under 42 U.S.C. § 1983. For the following reasons, the Court grants defendants' request to reconsider and denies plaintiffs' motion for a preliminary injunction.

### I

This class action lawsuit was initially filed in 1993. Throughout this lawsuit, the plaintiff-class has sought permanent injunctive relief against Milwaukee County and the State of Wisconsin, through various county and state officials, essentially requesting that they be required to address various alleged deficiencies in Milwaukee County's foster care system. These deficiencies, plaintiffs argue, violate the rights of individual class members which are guaranteed by the federal constitution and certain federal statutes. The matter was initially assigned to another Court of this District. That Court, in a published decision, denied-in-part the State defendants' motion to dismiss. *See, Jeanine B, v. Thompson,* 877 F.Supp. 1268 (E.D.Wis.1995)(Reynolds, J., presiding). That motion had argued, *inter alla,* that only Milwaukee County had direct responsibility for the services at issue and that the federal statutes involved did not give rise to private rights of action. The matter was subsequently transferred to this Court.

Shortly after transfer, the State defendants moved for partial summary judgment on the constitutional issues. The Court denied the motion without prejudice. The Court did so because recent legislative developments at the State level had significantly altered the playing field. Specifically, the Wisconsin Legislature, as part of the State's 1995 budget legislation, passed a provision requiring the State Department of Health and Social Services ("DHSS") to submit a proposal to the Legislature and the Governor, by April 1, 1996, transferring authority and responsibility for Milwaukee County's child welfare services to the State. The legislation required DHSS to include within the proposal an implementation plan for taking over the provision of all child welfare services in Milwaukee County beginning January 1, 1998. Because the plaintiffs sought only injunctive relief—meaning a court order that the State and County defendants take action to address the deficiencies in Milwaukee County's child welfare system—it was obvious to the Court that the State takeover impacted dramatically on the possibility for relief in this case. For that reason—and in deference to the State's political branches, where resolution of the current dispute is most properly addressed—the Court denied the summary judgment motion and adjourned the trial date in order to entertain briefs concerning whether the case was rendered moot by the legislative action. The Court subsequently ruled that the State takeover indeed mandated summary judgment for the State on plaintiffs' constitutional claims and also—as a practical matter—was likely to render moot any potential relief on plaintiffs' constitutional claims against the County. Plaintiffs' federal statutory claims were allowed to go forward, however, in part because the defendants had not asked the Court to reconsider Judge Reynolds' prior ruling that the statutes at issue gave rise to federal rights enforceable under § 1983.

Plaintiffs subsequently filed their current motion for immediate injunctive relief. Their basic claim is that the pending State takeover has only exacerbated-at least in the short term—the problems within Milwaukee County's child welfare system; specifically, the County's Child Protective Services Unit

("CPS"). They claim the situation has become so bad that the Court must exercise its equitable powers to put in place certain stop-gap measures designed to alleviate the breakdown within CPS.[1] In support of this claim, they submit 17 affidavits from individuals involved in the child welfare system. These affidavits detail 27 separate stories of tragic child abuse and neglect within Milwaukee County. The stories are alleged evidence of a "state of crisis" within the child welfare system and the defendants' "total abdication of their legal responsibility to investigate and act upon reports of child abuse". Plaintiffs argue that CPS is so grossly understaffed, and/or that CPS employees are so grossly undertrained, that CPS simply cannot and will not promptly receive and investigate increasing reports of child abuse. Their affidavits describe a system that is "completely overwhelmed", social workers that are "too overworked and inadequately trained", and case loads that make it "physically impossible to go out and promptly investigate all of the reports of abuse and neglect". Such allegations are not new to this case, but plaintiffs argue that the "situation has only grown worse" and that immediate judicial intervention is needed to prevent a complete breakdown of the system.[2]

1. Specifically, plaintiffs ask the Court to order the County and/or the State (1) to provide sufficient staff and telephone lines so that mandated reporters can quickly report potential instances of abuse 24–hours–a–day, seven days a week; (2) to ensure proper staffing and training so that reports of abuse are investigated promptly; and (3) to establish an appropriate monitoring and quality assurance program. (Plaintiffs' Brief in Support at 2–3.) In response, the defendants argue that the current takeover plan already addresses all of these concerns, that they have developed a formal work plan to achieve those goals in time for the 1998 takeover, and that plaintiffs' current motion only jeopardizes their ability to carry out these tasks. (State's Brief in Opposition at 5–9; County's Brief in Opposition at 7–8.)

2. In a prior order, the Court ordered plaintiffs' counsel to produce the names of the children referenced in the affidavits submitted in support of their motion, so that the defendants could investigate the claims and determine whether these instances truly demonstrated a breakdown of the system. Plaintiffs promptly sought reconsideration, maintaining that they did not have the names at issue, that the names were only known

In response, the defendants ask the Court to reconsider Judge Reynolds' prior conclusion that CAPTA—the statute underlying plaintiffs' current request for injunctive relief—gives rise to federal rights enforceable under § 1983. Plaintiffs reply that Judge Reynolds' prior decision is the law of the case and that there is no basis for reconsidering the same. Plaintiffs also argue that Judge Reynolds' decision was the right decision under the law and therefore, even upon reconsideration, this Court should reach the same conclusion. The following decision is thus divided into two parts: (1) Analysis of the law-of-the-case doctrine; and (2) analysis of whether CAPTA creates federal rights enforceable in an action under 42 U.S.C. § 1983.

## II

The current "law-of-the-case" is found in Judge Reynolds' prior decision denying the bulk of the State defendants' motions to dismiss. *See, Jeanine B. v. Thompson*, 877 F.Supp. 1268 (E.D.Wis.1995). The law-of-the-case doctrine generally holds that " 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages of the same case.' " *United States v. Cleveland*, 1995 WL 535110 *3 (N.D.Ill.1995), quoting *Donohoe v.*

by the affiants themselves, and that the Court's Order was not directed to the affiants and was therefore ineffective. In response, the Court ordered the parties to submit an order to the Court requiring the affiants themselves to produce the names, subject of course to an appropriate confidentiality order protecting the children and other individuals involved. The Court has no idea whether this order was carried out. It is noteworthy, however, that the results of an investigation into one of the children described in plaintiffs' affidavits—whose identity the defendants learned by happenstance—uncovered substantial evidence that, at every step of the process, CPS and the County did what it could for the child. Thus, the claim that this particular child's situation evidenced a breakdown in the child welfare system was, if not without merit, certainly questionable. (See, Aiken Aff. at ¶¶ 2–15.) To date, plaintiffs have not explained or otherwise addressed this particular discrepancy between what was alleged and what the case records actually revealed. At the very least, the discrepancy raises questions about the reliability of the anecdotal information contained in plaintiffs' affidavits.

*Consolidated Operating & Prod. Corp.*, 30 F.3d 907, 910 (7th Cir.1994), quoting, *Arizona v. California*, 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983). Put another way, "the same issue presented a second time in the same case in the same court should lead to the same result." *LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C.Cir.1996). The 7th Circuit has stated that "[t]he law of the case doctrine is not to be lightly disregarded. It is 'based on the salutary and sound public policy that litigation should come to an end.'" *Rothner v. City of Chicago*, 929 F.2d 297, 301 (7th Cir. 1991), quoting, *Shakman v. Dunne*, 829 F.2d 1387, 1393 (7th Cir.1987), quoting, *White v. Murtha*, 377 F.2d 428, 431 (5th Cir.1967), *cert. denied*, 484 U.S. 1065, 108 S.Ct. 1026, 98 L.Ed.2d 991 (1988). To this end the 7th Circuit states that the doctrine should be applied absent "unusual circumstances" or "compelling reason[s]". *Parts and Electric Motors, Inc. v. Sterling Electric, Inc.*, 866 F.2d 228, 231 (7th Cir.1988). Such circumstances include:

> (1) substantial new evidence that has come to light after the initial decision; (2) a subsequent opinion from a superior court of controlling authority that is contrary or inconsistent with the initial decision; and (3) a conviction that the initial decision was clearly erroneous and would work a substantial injustice.

*LaBoy v. Zuley*, 1993 WL 390249 *3 (N.D.Ill. 1993), citing, *Evans v. City of Chicago*, 873 F.2d 1007, 1014 (7th Cir.1989), *cert. denied*, 495 U.S. 956, 110 S.Ct. 2560, 109 L.Ed.2d 742 (1990).

"Unlike the doctrine of stare decisis, however, law of the case is a discretionary doctrine." *Redfield v. Continental Casualty Corp.*, 818 F.2d 596, 605 (7th Cir.1987). "Justice Holmes established early on that 'the phrase, law of the case, ... merely expresses the practice of courts generally to refuse to open what has been decided, not a limit to their power.'" *Id.*, quoting, *Mes-*

*singer v. Anderson*, 225 U.S. 436, 444, 32 S.Ct. 739, 740, 56 L.Ed. 1152 (1912). "[T]he doctrine is not a straightjacket. '[I]t is clear that all federal courts retain power to reconsider [issues] if they wish. Law of the case principles ... are a matter of practice that rests on good sense and the desire to protect both court and parties against the burdens of repeated reargument by indefatigable diehards.'" *United States v. Shannon*, 94 F.3d 1065, 1076 (7th Cir.1996), *vac'd on other grounds on reh'g en banc*, 110 F.3d 382 (7th Cir. 1997), quoting, Wright, Miller & Cooper, *Federal Practice and Procedure* § 4478. And while it is said that the law of the case has more "bite" when judges in one case are "changed in midstream", *Cleveland*, 1995 WL 535110 at *3, quoting *Williams v. C.I.R.*, 1 F.3d 502, 503 (7th Cir.1993), it is also said that "'the only restraint upon a second judge in passing upon [an] interlocutory issue decided by another judge in the same case is one of comity ..., which in no way infringes upon the power of the second judge to act.'" *American Telephone & Telegraph Co. v. Intrend Ropes & Twines, Inc.*, 944 F.Supp. 701, 707 (C.D.Ill.1996), quoting, *Bowles v. Wilke*, 175 F.2d 35, 37 (7th Cir.1949), *cert. denied*, 338 U.S. 861, 70 S.Ct. 104, 94 L.Ed. 528 (1949). As in most matters left to a trial judge's discretion, the question must be decided on a case-by-case basis:

> At bottom ... a court is neither obligated nor foreclosed from reconsidering its prior decisions; instead, the principles underlying motions to reconsider and the law of the case doctrine must be meted out in the individual case to arrive at a proper exercise of the court's discretion.

*In re the August, 1993 Regular Grand Jury (Medical Corporation Subpoena)*, 854 F.Supp. 1403, 1406 (S.D.Ind.1994).

It is important to note that the case has not been brought to final judgment and has not—until recently—gone up on appeal.[3] Many of the cases cited by the plaintiffs in opposition to the defendants' current request

---

**3.** Plaintiffs recently filed an "appeal" with the 7th Circuit Court of Appeals, arguing that this Court's alleged failure to hold an immediate hearing on their request for an injunction was tantamount to an order denying their request, which denial would be immediately appealable to the 7th Circuit. The 7th Circuit disagreed, stating that this Court was proceeding "in a timely and orderly fashion", and dismissed the appeal for lack of jurisdiction. *See, Jeanine B. v. Thompson*, Appeal No. 97–1982 (7th Cir. 5/16/97).

for reconsideration are cases concerning either multiple appeals in the same case, where the question is whether a decision on a rule of law made by the first appellate court is binding on the second appellate court, or cases which have previously gone to final judgment, were appealed, and are back before the trial court on remand, where the question is whether the trial court should revisit matters determined on appeal. That plaintiffs cite such cases is not unusual, as "the law of the case is most commonly invoked upon remand from an appellate ruling on a question of law...." *In re Soybean Futures Litigation*, 892 F.Supp. 1025, 1042 (N.D.Ill.1995)(emphasis added); *see also, Redfield*, 818 F.2d at 605 ("... the law of the case doctrine is most commonly applied to govern the conduct of litigation on remand after an appeal,...."). Plaintiffs' reliance on such cases is significant, however, because "[i]n matters involving interlocutory orders, such as motions to dismiss, or matters that have not been taken to judgment or determined on appeal, the Seventh Circuit has made clear that the district courts have the discretion to reconsider the decisions at any time." *Soybean Futures*, 892 F.Supp. at 1042; citing, *Cameo Convalescent Center, Inc. v. Percy*, 800 F.2d 108, 110 (7th Cir.1986). "The law is clear that decisions of a lower court that have not been ruled on by the appellate court can be reconsidered at the request of a party by the lower court at anytime prior to the entry of final judgments. All such decisions are interlocutory and can be reconsidered when justice requires. This is the reciprocal to the law of the case doctrine: upon remand a district court may reconsider any matter that is not expressly or implicitly part of the decision of the court of appeals." *United States v. Windom*, 82 F.3d 742, 746 (7th Cir.1996) (citation omitted).

Thus, while the law-of-the-case doctrine is not to be lightly disregarded, it has significantly less "bite" in situations such as this involving an interlocutory decision that

has not been reduced to final judgment and has not been reviewed or determined on appeal. And, as explained below, there are sound reasons for departing from Judge Reynolds' prior decision.

## III

It is well settled that 42 U.S.C. § 1983 provides a private right of action for violations of federal statutes. *Maine v. Thibotot*, 448 U.S. 1, 4, 100 S.Ct. 2502, 2504, 65 L.Ed.2d 555 (1980). In order to assert a statutory claim under § 1983, however, a plaintiff must assert the violation of a federal right, not merely a violation of federal law. *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 106, 110 S.Ct. 444, 448–49, 107 L.Ed.2d 420 (1989). The U.S. Supreme Court "traditionally look[s] at three factors when determining whether a particular statutory provision gives rise to a federal right." *Blessing v. Freestone*, — U.S. —, —, 117 S.Ct. 1353, 1359, 137 L.Ed.2d 569 (1997). "First, Congress must have intended that the provision in question benefit the plaintiff."*Id.*, citing, *Wright v. City of Roanoke Redevelopment and Housing Authority*, 479 U.S. 418, 430, 107 S.Ct. 766, 773–74, 93 L.Ed.2d 781 (1987). "Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial competence." *Id.*, citing *Wright*, 479 U.S. at 431–32, 107 S.Ct. at 774–75. "Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory rather than precatory terms." *Id.*, citing *Wilder v. Virginia Hospital Ass'n*, 496 U.S. 498, 510–11, 110 S.Ct. 2510, 2517–18, 110 L.Ed.2d 455 (1990) and *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 17, 101 S.Ct. 1531, 1539–40, 67 L.Ed.2d 694 (1981). This is the analysis which the Court must apply to the provisions of CAPTA at issue in this lawsuit.[4]

---

4. The State also suggests a fourth consideration, that being the amount of funding provided under the statute compared with the cost of complying with the obligations allegedly imposed by the statute. (State's Brief in Opposition at 10–11, 15–16.) The State submits that it receives in

excess of only $400,000 annually under CAPTA, while the costs of complying with the obligations asserted by the plaintiffs exceeds $5 million just for Milwaukee County alone. (*Id.*) Under such circumstances, the State argues that Congress could not possibly have intended to impose such

## A. THE SUPREME COURT'S RECENT DECISION IN *BLESSING V. FREESTONE*

A little over one month ago, the Supreme Court issued its decision in *Blessing v. Freestone*, — U.S. —, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997). *Blessing* did not alter the above analysis, but applied it in a manner that calls into question at least some aspects of Judge Reynolds' prior decision. *Blessing* addressed whether certain provisions contained in Title IV–D of the Social Security Act create federal rights enforceable through an action under § 1983. Title IV–D is part of the AFDC program, and provides that States, in order to qualify for federal AFDC funds, must certify that they will operate a child support enforcement program that conforms with the numerous requirements set forth in Title IV–D. The lawsuit was brought by five Arizona mothers who claimed an enforceable right to have the State's child support program achieve "substantial compliance" with the requirements of Title IV–D. The 9th Circuit concurred with their claim, but the Supreme Court reversed, applying the three-part test outlined above. And while *Blessing* deals with a different statute than those at issue here, there are aspects of the decision which directly impact upon Judge Reynolds' prior decision.

First, the Supreme Court chided the 9th Circuit for "taking a blanket approach to determining whether Title IV–D creates rights." *Blessing*, — U.S. at —, 117 S.Ct. at 1361. The Court said it is "impossible to determine whether Title IV–D, as an undifferentiated whole, gives rise to undefined 'rights.'" *Id.* at —, 117 S.Ct. at 1360. Rather, the Court said it is incumbent upon the plaintiffs to identify with particularity the specific rights they are claiming and the particular provision of the statute at issue supporting each claimed right. *Id.* Once that is done, the analyzing court must conduct a "methodical inquiry" that asks whether each particular claim and its corresponding statutory provision satisfies the three-part test set forth in *Wright* and *Wilder*. *Id.*

Second, the Supreme Court gave further definition to the general requirement that Congress must have intended the statutory provision at issue to benefit the plaintiffs. For instance, statutory provisions "designed only to guide the State in structuring its systemwide efforts", while they "may ultimately benefit individuals who are eligible for [statutory] services", do not give rise to enforceable rights. *Blessing*, — U.S. at —, 117 S.Ct. at 1361. Any benefit conferred by such provisions upon specific individuals is "indirect[ ]" at best and thus does not "fit [the Supreme Court's] traditional three criteria for identifying statutory rights." *Id.* The example given in *Blessing* was Title IV–D's extensive and detailed requirements regarding the composition of each State's child support data processing systems. "Obviously, these complex standards do not give rise to individualized rights to computer services. They are simply intended to improve the overall efficiency of the States' child support enforcement scheme." *Id.*

Third, the Supreme Court applied similar reasoning in rejecting the notion that a federal statute could give rise to an individual right in the maintenance of "sufficient" staffing levels in state agencies. For instance, the plaintiffs in *Blessing*, like the plaintiffs here, alleged that delays in case processing were attributable to "extraordinary staff shortages, inordinately high caseloads and unmanageable backlogs." *Id.* The Supreme Court acknowledged that Title IV–D and its implementing regulations generally required each State to establish a child support enforcement unit with "sufficient staffing" and organization. *Id.* at ———, 117 S.Ct. at 1361–62. Such mandates, however, did not give rise to a federal right:

> For one thing, the link between increased staffing and the services provided to any

---

a huge financial obligation upon the State in return for such a small financial contribution to the effort. (*Id.*) While this argument makes good sense, plaintiffs dispute the amount of funds received by the State in exchange for its compliance with CAPTA, and further argue that there is

no justification for defendants' failure to raise this issue in their prior motion to dismiss. (Plaintiffs' Reply Brief at 5–6.) Because the Court finds CAPTA unenforceable on other grounds, it need not decide the issue.

particular individual is far too tenuous to support the notion that Congress meant to give each and every Arizonan who is eligible for Title IV–D the right to have the State Department of Economic Security staffed at a "sufficient" level. Furthermore, neither the statute nor the regulation gives any guidance as to how large a staff would be "sufficient."

*Id.* at ——, 117 S.Ct. at 1362.

### B. CAPTA

In their complaint, plaintiffs claimed that they have three enforceable federal rights under CAPTA which have been violated by these defendants: (1) the right to prompt and appropriate investigation of reports of child abuse or neglect; (2) the right to protection from those who endanger their health and welfare; and (3) the right to such administrative procedures, trained and qualified personnel, programs and facilities that are necessary to deal effectively with child abuse and neglect. (Complaint at ¶ 262.) Plaintiffs modified these rights somewhat in their motion for preliminary injunction, arguing that they have a right to (1) "a system able to receive allegations of suspected child abuse or neglect", citing 42 U.S.C.A. § 5106a(b)(1) (1995); (2) "a system for promptly investigating reports of suspected child abuse or neglect, and immediately acting to protect abused or neglected children", citing 42 U.S.C.A. § 5106a(b)(2) (1995); and (3) "adequate staffing, training, personnel, programs, services and facilities to carry out" the two latter tasks, citing 42 U.S.C.A. § 5106a(b)(3) (1995). (Plaintiffs' Brief in Support at 19–20.)

As indicated, the language of the above claims is drawn directly from CAPTA provisions codified at 42 U.S.C.A. § 5106a (1995). However, it is drawn from an old version of § 5106a in effect at the time the complaint was filed and when Judge Reynolds issued his decision. Since that time, § 5106a was amended and rewritten via the Child Abuse Prevention and Treatment Act Amendments of 1996, Pub.L. 104–235 § 107 ("the 1996 Act" or "the Act"), enacted on October 3, 1996. By themselves these changes, if applicable, provide a strong justification for reconsideration of Judge Reynolds' prior decision.

Although the applicability of the 1996 Act is not easy to determine (as shown by the following discussion), analysis under either version of CAPTA provides a basis for reconsideration. The 1996 Act does not appear to have an explicit effective date. In such cases the statute is generally effective as of the date it was signed into law; here, October 3, 1996. That does not end the matter, however, because the Act seems to extend the applicability of the old version of the statute to any "existing grants" in effect on the date the Act was passed:

"(a) IN GENERAL.—Notwithstanding the enactment of the Child Abuse Prevention and Treatment Act Amendments of 1996, a State or entity that has a grant, contract, or cooperative agreement in effect, on the date of the enactment of such Act, under any program described in subsection (b), shall continue to receive funds under such program, *subject to the original terms under which such funds were provided under the grant,* through the end of the applicable grant cycle."

Pub.L. 104–235 § 204 (emphasis added). Subsection (b) includes "The Emergency Child Abuse Prevention Services grant program under section 107A of this Act" (*i.e.,* CAPTA), as one of the grant programs grandfathered under the terms of § 204. Thus, if the State is currently operating under a CAPTA grant which was already in effect on October 3, 1996, it seems the grant is subject to the terms of the old statute; that is, "subject to the original terms under which such funds were provided under the grant, . . . ."

According to an affidavit submitted by the State defendants, the State submitted its most recent CAPTA grant application on July 12, 1996. (Dibble Aff., Ex. A, ¶ 2.) The grant was awarded to the State on September 30, 1996. (Dibble Aff., Ex. B, ¶ 3.) The grant covered federal fiscal year 1996, which extends from October 1, 1996 through September 30, 1997. (Dibble Aff. at ¶¶ 2–3.) Thus, the State apparently did have a CAPTA grant already in effect on October 3, 1996. The grant cycle attributable to that grant extends through September 30, 1997.

Accordingly, the State may continue to be bound by the old version of CAPTA until the next grant cycle begins for federal fiscal year 1997, *i.e.*, until October 1, 1997. This may explain why the parties continue to discuss the old version of the statute and do not even mention the changes brought about by the 1996 Act. It also explains why, as previously mentioned, the Court analyzes both versions of the statute and concludes that neither the old nor the new version of CAPTA gives rise to federal rights enforceable under § 1983.[5]

### 1. The Old Version of CAPTA

 Under the old version of § 5106a, a State had to have in effect a State law relating to child abuse and neglect which included "provisions for the reporting of known and suspected instances of child abuse and neglect; . . . ." 42 U.S.C.A. § 5106a(b)(1)(A) (1995). Arguably separate from this requirement, there was also a requirement that each State "provide that" there be "prompt[ ]" investigations of all reports of known or suspected child abuse or neglect and take "immediate steps" to protect the health and welfare of any abused or neglected child. 42 U.S.C.A. § 5106a(b)(2) (1995). Finally, each State was required to "demonstrate that there are in effect throughout the State, in connection with the enforcement of child abuse and neglect laws and with the reporting of suspected instances of child abuse and neglect, such—

(A) administrative procedures;

(B) personnel trained in child abuse and neglect prevention and treatment;

(C) training procedures;

(D) institutional and other facilities (public and private); and

(E) such related multidisciplinary programs and services,

as may be necessary or appropriate to ensure that the State will deal effectively with child abuse and neglect cases in the State; . . . ."

42 U.S.C.A. § 5106a(b)(3) (1995). Plaintiffs describe this last requirement as meaning that each State must have "adequate staffing, training, personnel, programs, services and facilities to carry out" the tasks set forth in subsections (b)(1)(A) and (b)(2) of the old statute. (Plaintiffs' Brief in Support at 19–20.)

The foregoing is the version of the statute which Judge Reynolds interpreted as creating federal rights enforceable in an action under § 1983. However, the recent *Blessing* decision, as subsequent controlling precedent, provides a basis for reconsidering that ruling. For instance, plaintiffs claim that they have a right to such administrative procedures, trained and qualified personnel, and programs and facilities necessary to deal effectively with child abuse and neglect. This claim obviously stems from subsection (b)(3) of the old statute. Contrary to the "methodical inquiry" mandated under *Blessing*, Judge Reynolds did not isolate that provision of the statute to determine whether Congress intended that specific provision to benefit the plaintiffs. *Blessing*, —— U.S. at —— – ——, 117 S.Ct. at 1360–61. Indeed, he did not discuss the first element of the *Wilder* test in connection with CAPTA at all. *Jeanine B.*, 877 F.Supp. at 1285–86. Where he did apply the first element of the test, *i.e.*, with respect to plaintiffs' additional claims under the Adoption Assistance and Child Welfare Act, he merely stated that the statute as a whole was intended to benefit the plaintiffs. *Jeanine B.*, 877 F.Supp. at 1284, 1285. *Blessing* clearly rejects such a "blanket approach" to the issue. *Blessing*, —— U.S. at ——, 117 S.Ct. at 1361.

More importantly, in applying the first element of the *Wilder* test, *Blessing* made it clear that statutory provisions "designed only to guide the State in structuring its system-wide efforts" are *not* intended to benefit any specific individuals who may be entitled to services. Rather, any benefits conferred on individual plaintiffs by such provisions are

---

**5.** It bears noting that, under either version of the statute, the County claims that it cannot be liable under CAPTA because it is not a party to the funding transaction between the Federal Government and the State, and that any obligations imposed by CAPTA are therefore imposed on the State, not the County. (County's Brief in Opposition at 3–4.) This is another interesting issue which the plaintiffs strongly dispute (Plaintiffs' Reply Brief at 24, fn. 8), but which the Court need not address in this ruling.

"indirect[ ]" and do not "fit [the] traditional three criteria for identifying statutory rights." *Id.* One of the examples given by the Court in *Blessing* was the claimed right to "sufficient staffing" to enable the State to carry out its child support enforcement obligations. *Id.* at —— ——, 117 S.Ct. at 1361–62. Plaintiffs here similarly claim a right to "adequate staffing, training, personnel, programs, services and facilities to carry out" the State's responsibilities under CAPTA. (Plaintiffs' Brief in Support at 19–20.) The Supreme Court rejected the notion that such generalized requirements for sufficient levels of "staffing" or other organizational components evinced Congress' intent to confer a federal right:

> For one thing, the link between increased staffing and the services provided to any particular individual is far too tenuous to support the notion that Congress meant to give each and every Arizonan who is eligible for Title IV–D the right to have the State Department of Economic Security staffed at a "sufficient" level.

*Id.* at ——, 117 S.Ct. at 1362. The Court also implied that such generalized requirements fail the third element of the *Wilder* test, insofar as they are too vague and amorphous for judicial enforcement absent any statutory or regulatory guidance:

> Furthermore, neither the statute nor the regulation gives any guidance as to how large a staff would be "sufficient."

*Id.*

Here, "the link" between plaintiffs' claims for increased staffing, better training, better or more facilities, etc., and the services provided to any particular child is just as "remote" as that rejected in *Blessing.* At most, subsection (b)(3) of the old statute was "designed … to guide the State in structuring its systemwide efforts"; it was not intended to give every Wisconsin child a federal right to a CPS unit with a certain number of phone lines or fax machines or a certain number of employees with a certain type or level of training. Nor does old § 5106a, nor any federal regulation issued thereunder, define what would constitute "necessary and appropriate" procedures, training, personnel, facilities or programs to "deal effectively with

child abuse and neglect cases…." *See,* 42 U.S.C.A. § 5106a(b)(3) (1995) and 45 C.F.R. § 1340.1 *et. seq.; see also, Watson v. Dowling,* 1994 WL 319295 *4 (S.D.N.Y.1994). Thus, under *Blessing,* subsection (b)(3) of the old statute was not intended to confer any federal rights upon the plaintiffs and is too vague for judicial enforcement.

Plaintiffs claim *Blessing* is immaterial because "plaintiffs here are not seeking to enforce CAPTA's staffing provisions as a separate, unique requirement. Rather, plaintiffs seek sufficient staffing as a necessary prerequisite to fulfilling CAPTA's more specific mandates of 'prompt' investigations." (Plaintiffs' Correspondence to Court dated May 20, 1997.) *"Blessing,"* plaintiffs continue, "does not discuss whether a provision requiring 'prompt' investigations would be capable of enforcement", so the decision has no application to this case. (*Id.*) Such an argument creates a redundancy within the statute. It suggests that in addition to the express requirement in subsection (b)(3) that a State put in place all "necessary and appropriate" personnel, training, programs and facilities to meet its CAPTA obligations, there is also an implicit requirement that it do so; implicit, that is, in the very fact that the State is required to provide for "prompt" investigations. But why would Congress create an express requirement in this regard if the same was implicit in the requirements already created? And even if such an implicit requirement exists, how can it be said to create a federal right when—under *Blessing*—its express counterpart does not? It bears repeating that this analysis takes place within the context of trying to determine whether Congress "intended" to confer a direct benefit on the plaintiffs. Congress cannot have "intended" more by that which it said implicitly than by that which it said explicitly, at least where the same thing is being said in both contexts. Thus, to the extent that the State's obligations to pass a law for the reporting of known and suspected instances of child abuse, and to provide for "prompt" investigations of such reports, contain an implicit requirement for adequate staffing, training, programs and facilities to carry out those obligations, said requirement

does not give rise to a federal right enforceable under § 1983.

Plaintiffs' argument also seems a bit confused. As the Court reads the old version of CAPTA, it requires the State to do three things: (1) pass a law that includes provisions for the reporting of child abuse; (2) provide that child abuse reports are promptly investigated and that immediate steps are taken to protect the child at issue; and (3) create an adequate organizational structure to comply with numbers (1) and (2). Plaintiffs' CAPTA claims have always focused, at least substantively, on the third requirement; specifically, on the adequacy of the organizational structure within Milwaukee County's CPS unit. For instance, throughout this lawsuit, and particularly in connection with the current request for injunctive relief, the focus of plaintiffs' CAPTA claims has been that CPS is terribly understaffed, that the little staff it does have is inadequately trained, that it does not have enough phone lines to handle the volume of calls coming in, and that it does not have appropriate monitoring and quality assurance programs to adequately back-up and review its operations. (Plaintiffs' Brief in Support at 2–3, 7–10.) These are all claims which fall within the scope of the third requirement, which is to say they fall within subsection (b)(3) of the old statute. They should thus rise and fall depending on whether or not that provision of the statute gives rise to a federal right. The Court having found that it does not, the plaintiffs cannot simply pursue the same claims through the guise of the other two provisions of the statute.

■ Which leaves the question: What then is required by subsections (b)(1) and (b)(2) of the old statute? As for subsection (b)(1), the answer is simple. That section merely requires that the State "have in effect a State law relating to child abuse and neglect, including . . . provisions for the reporting of known and suspected instances of child abuse and neglect; . . . ." 42 U.S.C.A. § 5106a(b)(1)(A) (1995). Wisconsin clearly meets this requirement. *See*, Wis. Stat. § 48.981. Plaintiffs argue, however, that this provision requires the defendants "to maintain a system able to receive allegations of suspected child abuse or neglect." (Plaintiffs' Brief in Support at 19.) This interpretation simply rewrites the statute. Subsection (b)(1) requires a State law with certain provisions, nothing more. It does not require that the State "maintain" a child abuse reporting "system" that is capable of working properly in every single instance, which in turn could give rise to the "direct" benefit *Blessing* requires.

■ As for subsection (b)(2), the answer is more difficult. That section requires the State to "provide that" investigations of reports of child abuse be "initiated promptly" and, if any given report proves true, to further "provide that" "immediate steps" are taken to protect the child at issue. 42 U.S.C.A. § 5106a(b)(2) (1995). Judge Reynolds did not elaborate on what this language meant and required; he only stated generally that the language was couched in "mandatory" terms and was not so "vague and amorphous" as to be nonjusticiable. *Jeanine B.*, 877 F.Supp. at 1286. Even accepting this position as correct, the defendants have not violated plaintiffs' rights under this provision of CAPTA. The argument turns upon the meaning of the phrase "provide that", something Judge Reynolds did not address in his prior opinion. The D.C. Circuit Court of Appeals has addressed it, however, in a decision issued subsequent to Judge Reynolds' decision. The D.C. Circuit concluded that the phrase did not, as suggested here by the plaintiffs, impose a direct and independent obligation upon the State to itself provide prompt investigations:

> Our reading follows the plain language of the statute. CAPTA does not say that a "state shall" investigate promptly; it says that a "state shall provide that" investigations shall be initiated.

*Doe v. District of Columbia*, 93 F.3d 861, 866, n. 6 (D.C.Cir.1996). The Circuit Court found that the District of Columbia fulfilled this requirement through a provision in its child abuse statute requiring investigations of child abuse reports within 24 hours, regardless of whether that requirement was actually fulfilled in every, or any, specific case:

Like the Adoption Act provisions analyzed in *Suter [v. Artist M.,* 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992)], the CAPTA provision at issue speaks in mandatory language. But it mandates merely that the state "provide that" investigations will occur when reports for abuse are received. One difference, of course, is the Adoption Act specifically requires states to submit a plan, whereas CAPTA grants states flexibility in how they choose to "provide that" investigations shall be initiated. The District has fulfilled this condition for funding in enacting the District of Columbia Prevention of Child Abuse and Neglect Act of 1977, D.C. CODE ANN. §§ 6–2102(b) & 6–2103(c), which provides, inter alia, that the Child Family Services Division (CFSD) "shall commence an investigation of all reports alleging neglect other than abuse within 24 hours of the receipt of the report" and that the police department shall "immediately" investigate reports of abused children. Even if Doe can demonstrate that the District of Columbia law was violated in this particular case, she does not have a cause of action under § 1983. Doe may not enforce the laws of the District of Columbia in federal court under § 1983, just as the respondents in *Suter* were not permitted to enforce the provisions contained in Illinois' plan under the Adoption Act.

*Id.* at 866–67.

Wisconsin's child abuse reporting statute contains the same requirements as the statute analyzed in *Doe, i.e.,* a requirement that a report of child abuse be investigated within 24 hours, Wis. Stat. § 48.981(3)(c), and a requirement that the police or sheriff take immediate steps to protect the child if there is reason to suspect that he or she is in danger, Wis. Stat. § 48.981(3)(b). Thus, under *Doe,* Wisconsin has not violated any rights plaintiffs may have under subsection (b)(2). This interpretation of the statute does not require the Court to reconsider Judge Reynolds' ruling vis-a-vis subsection (b)(2). It also brings a sensible construction to the statute as a whole, because it allows subsections (b)(2) and (b)(3) to have independent meanings, rather than the overlapping or redundant meanings implicit in plaintiffs' arguments.[6]

Additionally, this interpretation parallels the result that will eventually be compelled by the new statute. That is, regardless of whether the old or new version of the statute applies at this juncture, the new statute should apply to this case no later than October 1, 1997, the date upon which the State's next CAPTA grant is likely to go into effect. Because the Court concludes that the new statute does not give rise to any federal rights enforceable under § 1983 (see, Section IIIB–2, *infra* ), any relief sought by the plaintiffs under the old statute would arguably expire as of October 1 st, further calling into question the wisdom and/or effectiveness of granting any relief at this juncture.

Finally, the foregoing result is more consistent with what the Court believes to be the emerging and better interpretation of CAPTA. That is, the Court disagrees with the conclusion that CAPTA's terms are not too "vague and amorphous" to be judicially enforced. While reasonable minds may differ in this regard (which is why the Court does not rely upon this disagreement as a basis for reconsidering Judge Reynolds' decision),

---

**6.** Plaintiffs suggest that this interpretation itself creates a redundancy within the statute. Plaintiffs argue that subsection (b)(1) already requires the States to enact a child abuse law. They suggest that interpreting subsection (b)(2) as merely requiring the passage of an additional law is redundant. (Plaintiffs' Reply Brief at 17–18.) Moreover, if all Congress had in mind in enacting subsection (b)(2) was the enactment of additional laws, plaintiffs ask why that section is phrased so differently from subsection (b)(1)'s express reference to the passage of a statute. (*Id.*) The Court believes the interpretation provided in *Doe* does not create the redundancies or inconsistencies alleged by the plaintiffs. Subsec-

tion (b)(1) is unique because it *requires* the passage of a statute, a statute which itself only requires the *reporting* of child abuse. Subsection (b)(2) is concerned with the *investigation* of child abuse, not the reporting of the same, and under *Doe* the States have broad discretion in "providing that" such investigations are carried out. Unlike subsection (b)(1), that discretion includes, but does not require, the passage of a statute providing for the same. Presumably the States can meet this requirement in a number of different ways other than by passing a statute, and that provides an important distinction between subsections (b)(1) and (b)(2).

it also believes that the current trend in federal appellate court decisions is contrary to Judge Reynolds' decision. In *Doe*, for example, a decision subsequent to Judge Reynolds' decision, the D.C. Circuit concluded that CAPTA was more like the provisions of the Adoption Assistance and Child Welfare Act at issue in *Suter*, which the Supreme Court rejected as a basis for enforceable rights, than the provisions of the Medicaid legislation at issue in *Wilder*, which the Supreme Court accepted as a basis for enforceable rights. Thus, *Doe* states that CAPTA imposes only a general duty upon the State which does not unambiguously confer an enforceable right upon its beneficiaries:

> In *Suter*, the Supreme Court was careful to point out that the Medicaid legislation at issue in *Wilder* "set forth in some detail the factors to be considered" in setting rates. The Court distinguished the Adoption Act, noting that it provided no guidance in how to measure reasonable efforts. The Court in *Suter* made this determination despite regulations promulgated under the Adoption Act which provide a laundry list of services that may be included in a state's proposal. CAPTA analogously fails to offer a definition of what constitutes a "prompt investigation." The CAPTA regulations, like those promulgated under the Adoption Act, merely offer myriad suggestions of what an investigation may include. See, e.g., 45 C.F.R. § 1340.14(d), (f) (1995). Unlike the regulations in *Wilder*, the CAPTA regulations do not mandate factors that must be part of an "investigation." See *Wilder*, 496 U.S. at 519, 110 S.Ct. at 2522–23 (noting that "the statute and regulation set out factors which a State must consider in adopting its rates") (emphasis added). The striking parallels to the Adoption Act and its related regulations place this case squarely under the rationale of *Suter* and therefore Wilder is distinguishable.

*Id.* A similar position was adopted by the 6th Circuit in *Tony L. v. Childers*, 71 F.3d 1182 (6th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1834, 134 L.Ed.2d 938 (1996). *Tony L.* held that CAPTA was too vague to be enforced by the courts:

> Ultimately, neither CAPTA nor the relevant regulations mandate a particular means of investigation or state what type of actions must be taken to protect abused or neglected children. Defendants retain discretion under CAPTA to disregard the examples provided.
>
> It is apparent, and reasonable, that Congress wanted to leave states a certain amount of discretion in this area. If we were to hold that Defendants should have taken some action, we would run the risk of limiting the discretion inherent in Defendants' duties under CAPTA.

*Id.* at 1189.

Plaintiffs argue that *Doe* and *Tony L.* are simply incorrect, citing decisions in *Albiston v. Maine Comm'r of Human Services*, 7 F.3d 258 (1st Cir.1993) and *Kindred v. Duckworth*, 9 F.3d 638 (7th Cir.1993). These cases are distinguishable. *Albiston* asked whether requirements for "prompt" disbursement of "pass-through" payments under Title IV–D (the statute at issue in the *Blessing* decision), and "reasonabl[y] prompt[ ]" disbursement of "gap" payments under Title IV–A, are capable of judicial enforcement. The Court found they were, but the underlying circumstances are significantly different than those involved here. First, the tasks which had to be performed "prompt[ly]" were precisely delineated by the statute and the underlying regulations, *i.e.*, the disbursement of a set and/or mathematically determined sum of money. The "investigations" and "steps" which CAPTA says should be conducted "prompt[ly]" and/or "immediate[ly]" are not so precisely delineated; indeed, the regulations allow the States wide discretion and provide only a laundry list of actions which may be, but need not be, taken in this regard. Second, the regulations at issue in *Albiston* provide express guidance as to what is "prompt", *i.e.*, fifteen days for pass-through payments and, in the case of gap payments, without any delays attributable to the State's administrative process. The regulations implementing CAPTA simply do not discuss what qualifies as "prompt", nor do they generally discuss when an investigation must be conducted or when responsive steps must be taken.

*Kindred* asked whether a consent decree requiring prison officials to, among other

things, "prompt[ly]" deliver and transmit a prisoner's confidential correspondence was generally enforceable. There was no argument against enforceability on the grounds that the "prompt[ness]" requirement was too vague to be judicially enforced. Moreover, in the context of a consent decree, a court interprets such a phrase because it must in order to resolve the dispute between the parties. It is an entirely different question to ask whether a phrase in a statute is sufficiently vague for purposes of determining whether or not Congress intended the statute to create federal rights enforceable under § 1983. The latter is the issue before this Court and *Kindred* simply does not speak to it.

In summation, *Blessing* provides a basis for reconsidering some parts of Judge Reynolds' prior ruling regarding the private enforceability of the old version of CAPTA. Moreover, Judge Reynolds' prior decision did not purport to interpret what the statute required vis-a-vis subsection (b)(2); specifically, what is meant by the requirement that the State "provide that" there be prompt investigations of child abuse reports. Based on the D.C. Circuit's and 6th Circuit's subsequent decisions in *Doe* and *Tony L.*, the Court concludes that the State has met its obligations under that language. That conclusion coincides not only with what will be the state of the law as of October 1, 1997, but also with what the Court believes to be the better interpretation of the old statute.

## 2. The New Version of CAPTA

█ The new version of CAPTA is structurally quite different from the old version.

Under the new version, the plan submitted by each State to qualify for a CAPTA grant must include "to the maximum extent practicable, ... an outline of the activities that the state intends to carry out ... to achieve the purposes of this subchapter." 42 U.S.C.A. § 5106a(b)(2) (Supp.1997). This outline must contain "an *assurance in the form of a certification by the chief executive officer* of the State that the State *has in effect and is enforcing a State law, or has in effect and is operating a Statewide program*, relating to child abuse and neglect...." 42 U.S.C.A. § 5106a(b)(2)(A) (Supp.1997) (emphasis added). Any such "State law" or "Statewide program" must include—

(i) provisions or procedures for the reporting of known and suspected instances of child abuse and neglect;

(ii) *procedures* for the immediate screening, safety assessment, and prompt investigation of such reports;

(iii) *procedures* for immediate steps to be taken to ensure and protect the safety of the abused or neglected child ... and ensuring their placement in a safe environment;....

42 U.S.C.A. § 5106a(b)(2)(A)(i)–(iii) (Supp. 1997) (emphasis added). Also, the new statute drops the language of the prior statute requiring States to demonstrate that they had the "necessary and appropriate" personnel, training, procedures, programs, services and facilities to "deal effectively with child abuse".[7] 42 U.S.C.A. § 5106a(b)(3) (1995).

The new statute requires reconsideration of Judge Reynolds' decision. First, under

---

7. The only language of the new statute even remotely close to this prior language is found at § 5106a(b)(2)(C), which requires the State plan to include—

 A *description* of—
 (i) the services to be provided under the grant to individuals, families, or communities, either directly or through referrals aimed at preventing the occurrence of child abuse and neglect;
 (ii) the training to be provided under the grant to support direct line and supervisory personnel in report taking, screening, assessment, decision making, and referral for investigating suspected instances of child abuse and neglect; and
 (iii) the training to be provided under the grant for individuals who are required to re-

port suspected cases of child abuse and neglect;....

42 U.S.C.A. § 5106a(b)(2)(C)(i)–(iii) (Supp.1997)(emphasis added). The primary focus of the new language is on the "services" and "training" to be provided under each State's respective grants. The new language does not mandate any particular level of training or services, calling only for a "description" of the same. Nor does the new language even purport to set forth any general standards for the State's "training" and "services", such as the prior statute's reference to all "necessary and appropriate" procedures, personnel, training, programs and facilities "to ensure that the State will deal effectively with child abuse and neglect cases...." 42 U.S.C.A. § 5106a(b)(3) (1995).

the old statute, one could at least argue that, in addition to the requirement for a State law providing for the reporting of known or suspected instances of child abuse, the State had separate obligations to (1) provide for prompt investigations and immediate steps in response to reports of child abuse; and (2) demonstrate that it had sufficient personnel, training, procedures, programs, services and facilities to carry out that responsibility.[8] Under the new statute, the State has the single obligation of *assuring* the Secretary that it *has and enforces a State law* which includes *procedures* for the immediate screening, safety assessment, and prompt investigation of child abuse reports, as well as *procedures* for the taking of immediate steps to protect the safety of an abused child. 42 U.S.C.A. § 5106a(b)(2)(A) (Supp.1997). If such a statute is in place, there is no separate requirement that the State actually *"provide"* prompt investigations of child abuse reports or immediate steps in response to such reports. Nor is there any requirement that the State *"demonstrate"* that it has in place sufficient personnel, training, procedures, programs, services or facilities, whether it be to enforce its State law, or to promptly investigate and respond to reports of child abuse, or to otherwise "deal effectively with child abuse and neglect cases in the State." 42 U.S.C.A. § 5601a(b)(3) (1995). All that is required is a state law or program containing certain procedures for investigating and responding to reports of child abuse.

There has never been any claim in this case that the State of Wisconsin does not have in place a state law relating to child abuse which contains the procedures called for in new § 5106a(b)(2)(A). The relevant statute is Wis. Stat. § 48.981, referenced earlier in this opinion. Section 48.981 provides for, in pertinent part: (1) the "immediate" reporting of all known or suspected instances of child abuse or neglect to the proper authorities—48.981 (3)(a); (2) the "immediate" investigation of such reports by the police or sheriff if there is reason to suspect that the child is in immediate danger, with the possibility of taking the child into custody if nec-

essary—48.981(3)(b); (3) in all other instances, an investigation by the relevant county child welfare department "[w]ithin 24 hours" after receiving a report of child abuse to determine whether the child is in need of protection or services, and including procedures governing such an investigation and additional provisions for either taking the child into custody or for the provision of other necessary services to the child or his family—48.981(3)(c)(1)–(3); and (4) the determination, "within 60 days" after receiving a report of child abuse, as to whether the reported abuse actually occurred or is likely to occur—48.981(3)(c)(4). These statutory provisions clearly meet the requirements of the new statute. Thus, even assuming that the new statute gives rise to federal rights enforceable under § 1983, those rights have not been violated here.

■ Plaintiffs complain, however, that the State is not adequately enforcing or complying with the requirements of § 48.981; specifically, that it does not provide for adequate staff, facilities, programs or training to promptly receive, investigate and respond to reports of child abuse, or otherwise carry out its child welfare responsibilities. (Plaintiffs' Brief in Support at 7–12.) As discussed in the previous section, this has always been the import of plaintiffs' CAPTA claims and is the consistent theme of the several affidavits submitted in support of plaintiffs' current request for emergency relief. But the language of the old statute supporting plaintiffs' claimed "right" to sufficient personnel, facilities, training, programs, etc., does not exist in the new statute. Moreover, as Judge Reynolds previously noted, the 11th Amendment precludes this Court from ordering the State to properly enforce or comply with its own laws, and CAPTA cannot be interpreted in a manner that effectively overrides the State's 11th Amendment immunity in this regard. *See, Jeanine B.*, 877 F.Supp. at 1276, 1279; *see also, Doe*, 93 F.3d at 866–67 ("Even if [plaintiff] can demonstrate that the District of Columbia law was violated in this particular case, she does not have a cause of

---

8. Note, however, that the *Doe* decision concluded that the State did not have a direct obligation under the old statute to itself provide prompt investigations of reports of child abuse, a conclusion with which this Court agrees. (See, Section IIIB–1, *supra*.)

action under § 1983. [Plaintiff] may not enforce the laws of the District ... in federal court under § 1983.").

Thus, if the new statute applies, it represents a subsequent change in the controlling law which clearly warrants reconsideration of Judge Reynolds' prior decision. Upon reconsideration, it is clear that plaintiffs' position is severely undercut by the new statute, and that the same either does not give rise to the rights claimed by the plaintiffs, or that said rights have not been violated by the defendants' conduct.

## IV

Defendants have only requested reconsideration of Judge Reynolds' decision concerning whether CAPTA gives rise to federal rights enforceable under § 1983; they have not requested reconsideration of the decision vis-a-vis plaintiffs' claims under the Adoption Assistance and Child Welfare Act ("AACWA"). Their failure to do so may stem from the fact that plaintiffs' motion for injunctive relief was based only on CAPTA, and also from the fact that *Blessing* was decided after the briefing on this matter was concluded. In any event, the Court believes, at least preliminarily, that *Blessing* impacts upon the continued validity of Judge Reynolds' decision that the AACWA creates federal rights enforceable under § 1983. To this end, the Court would like the parties to brief the issue of whether *Blessing* warrants reconsideration of Judge Reynolds' decision regarding the AACWA.

**NOW THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

1. Plaintiffs' motion for a preliminary injunction is denied;

2. Defendants' motion for reconsideration of Judge Reynolds' prior ruling on the private enforceability of CAPTA is granted, and plaintiffs' CAPTA claims are dismissed; and

3. The parties shall submit simultaneous briefs regarding whether the *Blessing* decision warrants reconsideration of Judge Reynolds' prior ruling on the private enforceability of the AACWA on or before July 7, 1997. The parties shall submit simultaneous reply briefs on or before July 21, 1997.